## McDEVITT MECHANICAL CONTRACTORS, INC.

v.

## The UNITED STATES.

### No. 531–88C.

United States Claims Court.

Oct. 23, 1990.

---

Norman A. Fox, Jr., Cleveland, Ohio, attorney of record, for plaintiff. Summers, Fox & McGinty, of counsel.

Margaret Lee Baskette, Washington, D.C., with whom was Asst. Atty. Gen. Stuart M. Gerson, for defendant. Evelyn M. Korschgen, of counsel.

## OPINION

MEROW, Judge.

This action is before the court on defendant's motion for summary judgment. It is based upon an express contract between plaintiff and the United States and has been brought pursuant to 41 U.S.C. § 609(a)(1) and 28 U.S.C. § 1491(a)(1). Plaintiff, McDevitt Mechanical Contractors, Inc. (McDevitt), seeks an equitable adjustment in contract price because defendant, National Aeronautics and Space Administration (NASA), allegedly changed the terms of their contract, and because McDevitt allegedly encountered differing site conditions. NASA counters that McDevitt's claims are not valid; that there is no genuine issue as to any material fact; and, therefore, that those claims should be summarily dismissed. For the following reasons, defendant's motion for summary judgment will be granted.

### Factual Background

On June 15, 1984, McDevitt entered into a contract with NASA to modify the Small Engine Components Facility in test cells CE–17 and CE–18 at the Lewis Research Center in Cleveland, Ohio. The contract required that McDevitt furnish and install one motor-driven, single-span, underhung bridge crane in Test Cell CE–18. On April 23, 1986, McDevitt submitted a claim to NASA in the amount of $208,205 for added costs due to errors and delays allegedly made by the government. NASA responded to that claim in September, 1987 by approving certain items and by rejecting others. McDevitt's complaint in this suit relates to Items 1 and 2 of Section V of that claim.

In Item 1, McDevitt seeks reimbursement in the amount of $1,488.30 for paying the electrical subcontractor to install the power wiring to the crane. Plaintiff argues that this electrification was not included in the contract. Compensation for Item 1 was denied by the contracting officer because "the electrical power wiring for the crane is explicitly specified in * * * Section 14380 * * * of the contract." Accordingly, the subcontractor's quote should have included the cost for electrification at the time of bidding.

McDevitt seeks in Item 2 an upward adjustment in price for the labor and materials expended when it encountered a differ-

ing site condition in the form of an elevation discrepancy. Specifically, the 36" diameter stainless steel inlet pipe in CE–18 required shortening by 1½" because the flange on the horizontal pipe interfered with the overhead crane. This modification took two men three weeks to build an angle frame supporting a 36" elbow, to remove the 1½" length, and to reweld the pipe support. NASA's contracting officer also rejected this item. She stated that installation of the inlet pipe in accordance with the specifications was strictly McDevitt's responsibility, the problems were not due to differing site conditions, and could have been avoided if plaintiff had made the required verification of field measurements.

*Discussion*

Disposition by summary judgment is appropriate when there is no genuine dispute as to any material fact and when the movant is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). By isolating and disposing of factually unsupported claims or defenses, the procedure is designed to save time and expense, thereby achieving judicial economy. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). To defeat a motion for summary judgment, the nonmovant must provide sufficient evidence that a genuine issue for trial does exist. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

In its first claim, McDevitt argues that there is a genuine issue as to whether the contract placed the responsibility of electrifying the crane on the prime contractor. Plaintiff alleges that the contract is ambiguous and that the intent of the parties is not clear because the specifications do not contain express language directing anyone to install the power wiring for the crane. McDevitt then draws attention to *Oil Trading Associates, Inc. v. Texas City Refining, Inc.*, 201 F.Supp. 846 (D.C.N.Y.1962) (citing *Severson v. Fleck*, 251 F.2d 920 (8th Cir.1958)), which held that summary judgment is not appropriate when a written agreement is ambiguous and the intent of the parties is in dispute.

It is well established that contract interpretation is a matter of law, and that a primary function of the court is to determine the parties' intent. *Dynamics Corp. of America v. United States*, 182 Ct.Cl. 62, 72, 389 F.2d 424, 429 (1968). To determine intent, the court should look to the written instrument, *ITT Arctic Services, Inc. v. United States*, 207 Ct.Cl. 743, 751, 524 F.2d 680, 684 (1975), giving reasonable meaning to all its portions. *Martin Lane Co. v. United States*, 193 Ct.Cl. 203, 215, 432 F.2d 1013, 1019 (1970). Furthermore, "a [c]ourt should ascribe to the contract language 'its ordinary and commonly accepted meaning,' without twisted or strained analysis." *Industrial Indem. Co. v. United States*, 14 Cl.Ct. 351, 356 (1988) (*citing Hol–Gar Mfg. Corp. v. United States*, 169 Ct.Cl. 384, 390, 351 F.2d 972, 976 (1965), and *Aero Mayflower Transit Co. v. United States*, 162 Ct.Cl. 233 (1963)).

■ Plaintiff maintains that the contract language referred to by NASA in this action detailed what products were to be used and what pre-electrification tests were to be performed, but did not direct anyone to do the actual electrification. However, plaintiff ignores certain portions of the contract specifications. Specifically, Subpart 1.2.1.3 of Section 01090 required McDevitt to "furnish and install" one motor-driven, single-span, underhung 4 ton bridge crane. The scope of the terms "provide," "furnish" and "install" are set forth in Section 01090, Part 1, Subpart 1.2, and mean "to supply and deliver to the project site, and install, *complete and ready for the intended use.*" (Emphasis added.) In addition, Section 14380, Part 3, Subpart 3.6, stated that, "[a]fter the completed crane complex is erected, adjusted, lubricated, and *made ready for operation,* it shall be tested in the presence of the Contracting Officer." (Emphasis added.) In essence, McDevitt is correct only to the extent that the specifications do not contain language expressly stating that the prime contractor is responsible for the electrification of the crane. Plaintiff *is* responsible for installing the

crane, complete and ready for the intended use, and for making it ready for operation. When viewed from the perspective of a "reasonably intelligent person acquainted with the contemporary circumstances," *Firestone Tire & Rubber Co. v. United States*, 195 Ct.Cl. 21, 30, 444 F.2d 547, 551 (1971), the language, "complete and ready for the intended use," included electrification.

In sum, McDevitt's interpretation of the contract would effectively delete significant provisions of the contract and therefore cannot prevail. *W.G. Cornell Co. v. United States*, 179 Ct.Cl. 651, 666–67, 376 F.2d 299, 309 (1967). Plaintiff is not entitled to reimbursement for its costs to electrify the crane.

■ McDevitt's second argument against summary judgment is based on a differing site condition claim. The Differing Site Conditions Clause in the contract presently at issue covers two types of situations. A Type I claim exists when there are "[s]ubsurface or latent physical conditions at the site differing materially from those indicated in this contract." Type II claims involve "unknown physical conditions at the site, of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in this contract." McDevitt alleges in this suit that it encountered a discrepancy in the elevation of the 36″ stainless steel inlet pipe. Inaccurate drawings are material misrepresentations of physical conditions and, therefore, McDevitt's demand must be reviewed as a Type I claim.

For a plaintiff to be successful on a Type I claim, it must "demonstrate that the conditions 'indicated' in the contract differ materially from those it encounters during performance. * * * As a threshold matter, then, this kind of Differing Site Conditions claim is dependent on what is 'indicated' in the contract." *P.J. Maffei Building Wrecking Corp. v. United States*, 732 F.2d 913, 916 (Fed.Cir.1984) (*quoting Arundel Corp. v. United States*, 207 Ct.Cl. 84, 105, 515 F.2d 1116, 1128 (1975), and *Foster Const. v. United States*, 193 Ct.Cl. 587,

603, 435 F.2d 873, 881 (1970)). A determination of what is represented by the agreement is a matter of contract interpretation and is a question of law to be decided by the court. *Foster Const., supra,* 193 Ct.Cl. at 601–02, 435 F.2d at 880. The contractor's interpretation must be reasonable. The question must be viewed from the perspective of a "reasonable and prudent" contractor. *P.J. Maffei,* at 917. In essence, the knowledge imputed to the plaintiff is that which a reasonable contractor would have from reading the contract documents.

McDevitt maintains that it made field measurements, that based on those measurements it submitted detailed shop drawings to NASA, and that it obtained NASA's approval of those drawings. Plaintiff then concludes that the elevations on the approved drawings caused the inlet pipe to interfere with the overhead crane. Because NASA's approval of the defective drawings is not in dispute, whether a reasonable contractor in plaintiff's situation would have understood the contract specifications, when taken as a whole, to place the responsibility of dimensions and elevations on defendant may be addressed as a question of law.

While the contract's "indications" may be either expressed or implied, *Foster Const., supra,* 193 Ct.Cl. at 593, 435 F.2d at 875, the contractor must examine the contract in its entirety, including all specifications, to determine what is actually indicated. The weight to be given to McDevitt's approved field drawings as an "indication" of conditions depends upon an examination of all available information. *J.F. Shea Co. v. United States,* 4 Cl.Ct. 46, 52 (1983). Accordingly, a review of all the relevant contract specifications is necessary to determine whether McDevitt was responsible for verifying its field measurements before proceeding to have the inlet pipe manufactured.

Specifically, Section 01095, Part 1, Subpart 1.1, requires that the contractor "lay out the work, establish grades and elevations, and be responsible for dimension and elevation." Section 01095, Part 1, Subpart 1.2., adds that the contractor shall check

the accuracy of the drawings' dimensions before ordering materials and "shall determine exact dimensions for proper fitting of the work." Section 15003, Part 1, Subpart 1.3, requires that the contractor provide additional bends and offsets as necessitated by job conditions, and that the contractor "obtain the exact requirements" before installing any equipment. With regard to approval by the contracting officer, General Provision 15 of the specifications states that such approval "shall not relieve the Contractor from responsibility for any errors or omissions in [shop] drawings, nor from responsibility for complying with the requirements of this contract." The language of these provisions clearly dictates that McDevitt was ultimately responsible for the proper installation of the inlet pipe despite any errors in the shop drawings.

This conclusion is buttressed by plaintiff's admission that it was responsible for establishing proper grades and elevation for work under the contract and for the proper fitting of the work, and its admission that it was required by the contract to perform measurements to verify dimensions shown on contract drawings.[1]

In light of these provisions and admissions, NASA has effectively disclaimed all responsibility for the verification of dimensions shown on the field drawings. Accordingly, no "reasonable and prudent" contractor in McDevitt's situation would have understood the government's approval of the drawings to absolve plaintiff from the obligation of determining the proper grades and elevations where the inlet pipe and the overhead crane would meet. Under these circumstances, the inaccurate shop drawings are not "indications" which would legally support a Type I claim.

■ McDevitt argues that summary judgment is not appropriate because evidence of custom and usage of the trade is necessary to interpret the agreement. Plaintiff alleges that it became the custom during the course of previous contracts with the government for NASA to orally insist that contract modifications be performed immediately with written change orders to be issued months later. In this case, McDevitt urges that Mr. Mike Slivka, an inspector for the project, orally insisted upon modification and orally agreed that plaintiff would be compensated for the additional costs to refabricate the inlet pipe. Additionally, McDevitt maintains that custom and usage of the trade dictates that once shop drawings are approved by the owner, the owner is responsible if the item manufactured according to the approved shop drawings is not suitable to the owner's needs. Because the inlet pipe was manufactured in accordance with the drawings approved by NASA, NASA would be responsible for any modifications to that pipe.

Whether plaintiff is correct in its assertions of custom and usage of the trade need not be considered because such evidence does not make McDevitt's interpretation reasonable. It is well established that "[t]rade custom or usage cannot be used to contradict plain contractual language." *Avedon Corp. v. United States*, 15 Cl.Ct. 771, 778 (1988). Where the provisions of a contract are unambiguous, an inconsistent trade practice cannot prevail. *George Hyman Const. Co. v. United States*, 215 Ct.Cl. 70, 81, 564 F.2d 939, 945 (1977). The provisions of McDevitt's contract which deal with shop drawings are not ambiguous. They expressly dictate that McDevitt was required to "determine exact dimensions for proper fitting," "be responsible for dimension and elevation," and be responsible for any errors in the drawings. Accordingly, plaintiff's proffered evidence of custom is not applicable in this action.

■ Plaintiff next argues that NASA's alleged oral promise to pay for the modification constituted a change in the scope of

1. Under RUSCC 36(a), a party may serve upon another party a written request for the admission of the truth of any matters. A matter is deemed admitted where the party to whom the request is directed does not serve upon the party requesting the admission a written answer or objection addressed to the matter. Because McDevitt has not responded to defendant's request for admission of February 3, 1989 and has not filed a motion seeking withdrawal of or amendment to Admissions 11, 13 and 14, they are conclusively established.

the contract and indicates the legitimacy of the claim. Despite affidavits to the contrary, plaintiff's assertion that Mr. Slivka made such a representation is accepted as true for purposes of summary judgment analysis. However, the truth of that assertion is not material to the disposition of this case. It is well settled that:

[n]o contract with the United States is valid unless it is executed by an official with actual authority to bind the government. One who purports to contract with the United States assumes the risk that the official with whom he deals is clothed with the actual authority to enter the contract alleged.

*City of Klawock v. United States,* 2 Cl.Ct. 580, 586 (1983), *aff'd,* 732 F.2d 168 (Fed.Cir. 1984) (*citing, Federal Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947)). Even if Mr. Slivka did advise plaintiff that the modifications would be paid for by NASA, the record establishes that he was not appointed a contracting officer's representative and, therefore, he did not have the authority to bind the government. Because there is no issue as to Mr. Slivka's lack of authority, it is not a material fact in dispute and this question remains ripe for summary judgment. Mr. Slivka did not have the authority to bind the government and any representation by him that NASA would pay for the modification would not constitute a change in the scope of the contract.

The final argument raised by plaintiff relates to NASA's treatment of Section V, Item 3, of McDevitt's claim which NASA paid. Plaintiff asserts that it is inconsistent for defendant to grant an equitable adjustment for Item 3, but not Item 2, when they both resulted from an asserted differing site condition involving dimensions. The record establishes that Item 3 involved a 36″ atmospheric exhaust pipe which was required to penetrate the roof. Because the roof's thickness was essential for installation, and because of the difficulty of verifying its measurements, the defendant agreed to an equitable adjustment.

Although also a vertical pipe, the inlet pipe in Item 2 led to a 90 degree elbow that fit horizontal connecting structures not fabricated under this contract. At no point did it penetrate the roof, and it was not contiguous with the exhaust pipe. Unlike the thickness of the roof, verification of the floor to ceiling dimension of test cell CE–18 would have been an unburdensome procedure prior to the fabrication of the pipe. McDevitt had the opportunity and obligation to learn the facts of the conditions at the site and, where McDevitt knew or should have known the dimensions of the test cell, it is estopped from claiming a changed condition. *Vann v. United States,* 190 Ct.Cl. 546, 571, 420 F.2d 968, 982 (1970).

*Conclusion*

For the foregoing reasons, it is ORDERED that defendant's Rule 56 motion is granted and that final judgment be entered dismissing the complaint, with no costs to be assessed.