**P.R. BURKE CORPORATION, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 96–232C, 96–445C.**

United States Court of Federal Claims.

Aug. 16, 2000.

Richard D. Corona, San Diego, California, for the Plaintiff. Sean Brew, San Diego, California, of counsel.

Gerald M. Alexander, Washington, D.C., with whom were Sharon Y. Eubanks, Deputy Director, David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, and Frank W. Hunger, Assistant Attorney General, for the Defendant.

## OPINION

BUSH, Judge.

This consolidated matter is before the court on the United States' motion for partial summary judgment, and involves two contracts for the repair and improvement of Sewage Treatment Plants Two and Three at the Marine Corps Base at Camp Pendleton, California. Prior to the commencement of work, the parties failed to agree on the proper sequence of work to perform the demolition and improvements to Sewage Treatment Plant Two. The parties' stalemate resulted in a significant delay to the commencement of actual performance. This delay at the start of the project forced P.R. Burke Corporation ("Burke") to accelerate its performance to meet the contract-mandated completion date and thereby incur additional costs.

Burke asserts that it is entitled to recover its additional costs because the Government

caused the initial delay by unreasonably denying Burke's proposed sequence of work and failing to furnish proper direction to Burke. The Government moves for partial summary judgment on this claim, contending that the Government's rejection of Burke's proposed sequence of work was proper under the terms of the contract. According to the Government, Burke should bear sole responsibility for the costs that resulted from the delay since Burke's unreasonable interpretation led to the parties' impasse. Because the subject of the motion for partial summary judgment is the interpretation of contract language and whether ambiguity existed in the contract—questions of law—the court's determination of the Government's motion is appropriate. The court concludes that Burke's interpretation is unpersuasive, and even assuming that Burke's interpretation was acceptable, Burke failed to inquire into a patent ambiguity. Therefore, the court grants the Government's motion for partial summary judgment.

## BACKGROUND

### I. Contract Provisions

On September 27, 1994, the United States, acting through the Department of the Navy, awarded Burke two fixed-price contracts for the repair and improvement of Sewage Treatment Plant Two ("STP 2") and Sewage Treatment Plant Three ("STP 3") at Camp Pendleton. Contract No. N68711–91–C–2175 (contract 2175 or contract) covered the work on STP 2, and obligated Burke to complete its work on October 7, 1995 for a total price of $2,930,374. Contract 2175 required both the demolition of existing structures and the installation of new ones to improve the treatment capabilities of STP 2. The project description in contract 2175 sets forth the following requirements:

the furnishing of all labor, approved materials, and equipment required for the demolition of the existing chlorine contact tank, trickling filter, imhoff tank, and mechanical equipment within the existing primary sludge pump station; sludge bed rehabilitation work; new aerated grit chamber and grit washer/hopper; new sludge pumps in the existing sludge pump station; two new trickling filters (using existing cleaned rock media) with flow splitter box and pump station; new secondary sludge pump station; new secondary clarifier; new chlorine contact tank; new solids contact basin and appurtenances; new sludge bed recycle pumps in existing wet well; new operations/laboratory building; and all the necessary appurtenances to make the facilities fully operational.

Def.'s App. at 14.

In performing its work, Burke was required to adhere to scheduling requirements set forth in paragraph 1.5 of section 01010 of the contract. The relevant portions of this section read:

b. The plant shall remain in operation during the entire construction period and the Contractor shall conduct his operations so as to cause the least possible interference with the normal operations of the activity.

c. The contractor shall be responsible for pumping out basins and pipelines of sewage or sludge so as to perform the work. This shall also include temporary pumping to maintain operation of the facility.

Def.'s App. at 17. The Index of Drawings included in the contract contains a Note which further specifies: "PLANT SHALL REMAIN OPERATIONAL AT ALL TIMES. CONTRACTOR TO SUBMIT CONSTRUCTION SCHEDULING AND BYPASS PLANS FOR CONTRACTING OFFICER'S APPROVAL."[1] Pursuant to these contract provisions, the Government retained the right to approve Burke's schedule.

Contract 2175 also contains drawings and specifications. Drawing C–1 provides an overhead drawing of the areas of STP 2 to be repaired. Pl.'s App. at 44. This drawing

---

**1.** Pl.'s App. at 41; Def.'s App. at 23. Contract 2175 also incorporates by reference the Federal Acquisition Regulation (FAR) standard clause entitled "Schedules for Construction Contracts" which requires Burke to submit three copies of its schedule indicating the order in which it proposes to perform its work. 48 C.F.R. § 52.236–15 (1994); Def.'s App. at 12.

indicates both the existing location of various structures and the planned location of the structures that Burke was to construct. In particular, this drawing depicts both the location of the existing trickling filter and the location of the two new trickling filters that Burke was to construct.[2] The southern trickling filter appears largely in the same area as the existing trickling filter. In addition, portions of the trickling filter pump station and chlorine contact tank that Burke was required to construct appear in the same location as the existing trickling filter. Another drawing, Drawing D–3, specifies in its note 5 that "EXISTING TRICKLING FILTER MEDIA WILL BE REMOVED, SELECTED AND CLEANED (SEE TRICKLING FILTER SPECIFICATIONS) FOR USE IN THE NEW TRICKLING FILTERS. EXCESS MEDIA SHALL BE DISPOSED OF ACCORDING TO LOCAL REGULATIONS (SEE SPECS.)" Pl.'s App. at 42. Specification 11365–2.1.5.3 governs the type of trickling filter media used in the new trickling filters and states in part: "[c]rushed stone/slag from the existing STP–2 trickling filter shall be utilized to the greatest extent possible." Def.'s Supp.App. at 5.

## II. Summary of Facts

After award, yet prior to commencing its work, representatives from Burke met with the Navy on October 24, 1994 to discuss the intended sequencing of Burke's work. On October 28, 1994, Burke submitted its demolition plan to the Navy. This plan's scope states that the "[s]equencing of operations is to work on the [sic] all the demolition concurrently. As excavation is done and the existing piping is removed, new piping will be installed." Def.'s App. at 49. As part of its plan, Burke also submitted a Contractor's Request for Station Utility Service Interruption, requesting that the Government interrupt the water and sewage services to STP 2 for the duration of the planned contract work. The effect of this plan would have been to shut down the existing trickling filter. According to Patrick R. Burke, the President and owner of P.R. Burke Corpora-

tion, Burke requested the effective shutdown of STP 2 with the realization that the Government would reject it, yet with the hope that the Government would respond with written direction detailing a project schedule that was consistent with the plans and specifications.

As Burke expected, the Contracting Officer, Jeffrey Allen, in a letter dated November 10, 1994, rejected Burke's intended schedule on the basis that Burke's plan to demolish existing structures concurrently and prior to constructing new operable structures would fail to maintain the continuous operation of STP 2. The Contracting Officer provided a suggested sequence of events, and requested that Burke submit a new sequence of work. The Government's suggested sequence provided for demolition of the imhoff tanks as well as for construction of the northern trickling filter and its placement on-line prior to demolition of the existing trickling filter. On December 22, 1994, the Government, in response to Burke's request for direction, reiterated its suggested sequence of events, and ordered Burke to submit a demolition and construction plan by December 29, 1994 that conformed to the Government's suggested sequence. In a separate letter of the same date, the Government, also noted that, if pending changes affected Burke's plan and schedule of events, Burke should document the changes in the demolition plan.

Burke submitted a new demolition plan and schedule. In discussing the planned demolition and removal of the existing trickling filter, Burke stated its assumption that the Government would issue a change order relocating the new trickling filter pump station outside of the existing trickling filter area. Burke's plan also requested further direction regarding the source of new filter media to be used in the two new trickling filters. In the cover letter enclosing these new plans, Burke asserted its position that adapting its plans to conform to the Government's suggested sequence would cost Burke approximately $400,000 and extend the estimated

---

2. The two trickling filters appear on the drawing as directly north and south of each other. The northern trickling filter did not appear in the same area as the existing trickling filter, but did appear roughly in the same area as the existing imhoff tank.

completion date to July 6, 1996. On January 11, 1995, the Government issued Modification 1, pursuant to the Changes Clause, FAR § 52.243–4, and thereby ordered Burke to move the trickling filter pump station away from the existing trickling filter. The modification did not change the contract price or completion date.

On January 12, 1995, Burke commenced work. On January 19, 1995, the Government approved Burke's demolition plan, but rejected Burke's adjusted performance schedule. On February 6, 1995, Burke presented a cost proposal to the Government, and an explanation of the additional costs that it would incur, allegedly as a result of conforming to the Government's sequence of work on STP 2 and other Government directions. Burke computed its additional costs to comply with the resequenced work, and based on this computation, Burke also calculated the additional accelerated performance costs that it would incur in order to adhere to the resequenced schedule and still meet the Contract's original completion date. In response, on March 20, 1995, the Contracting Officer demanded that Burke meet the original contract completion date, and denounced Burke's usage of the terms "resequenced" and "accelerated resequenced." Furthermore, the Contracting Officer denied any request for an adjustment to the price of contract 2175. Burke responded to this rejection by submitting a certified claim to the Contracting Officer pursuant to the Contract Disputes Act, 41 U.S.C. § 605(a) (1994). On December 22, 1995, the Contracting Officer denied Burke's claim in its entirety.

On July 24, 1996, Burke timely filed its complaint, which was assigned Case Number 96–445C. Burke's complaint includes ten causes of actions. In cause of action one (COA1), which is the subject of the Government's motion for partial summary judgment,[3] Burke alleges that, because of the Government's unreasonable rejection of Burke's original planned sequence of work and refusal to grant time extensions, Burke performed extra work, accelerated performance, and as a result incurred damages in the amount of $890,085.

The court has jurisdiction over this matter pursuant to the Contract Disputes Act, 41 U.S.C. § 609(a)(1), and the Tucker Act, 28 U.S.C. § 1491(a) (1994).

## DISCUSSION

### I. Summary Judgment Standards

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1390 (Fed.Cir.1987). A fact is material if it may affect the outcome of the suit. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. The moving party bears the initial burden of proof and may discharge its burden by demonstrating an absence of evidence to support the opposing party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The party opposing summary judgment has the burden of showing sufficient evidence of a genuine issue of material fact in dispute. *Celotex Corp.,* 477

---

**3.** Initially, the Government also moved for summary judgment on cause of action two (COA2) in Case Number 96–232C on the same grounds. In response to the Government's motion, Burke notes that its theory of recovery under COA2 is that the Government provided defective specifications and Burke encountered differing site conditions. Burke, therefore, contends that summary judgment is inappropriate as to COA2, because the Government mischaracterizes Burke's argument and accordingly fails to demonstrate the absence of a genuine issue of material facts regarding COA2. In its Reply Brief, the Government states that it is withdrawing its Motion for Partial Summary Judgment as it applies to Case 96–232C, assuming Burke premised its theory of recovery on defective specifications and unforeseen site conditions. The Government's Statement of Genuine Issues similarly remarks that the Government concedes that a genuine issue of material fact exists. Def.'s Statement Genuine Issues at 5. Based on a review of the parties' pleadings and other submissions, the court finds that Burke alleges in COA2 in Case 96–232C that defective specifications and differing site conditions caused it to incur additional costs. Accordingly, the court considers the Government's motion withdrawn as it pertains to COA2 in 96–232C. This opinion addresses only COA1 in Case Number 96–445C.

U.S. at 324, 106 S.Ct. 2548. Such evidence need not be admissible. *Id.* This court, in deciding whether a genuine issue of material fact exists, resolves doubt over factual issues in favor of the party opposing summary judgment. *Mingus Constructors, Inc.,* 812 F.2d at 1390.

■ While Burke's claim focuses upon the delay created prior to the commencement of its actual performance, the genesis of its claims and the present dispute to be decided by the court is purely a matter of contract interpretation. As this court has noted, "[p]ure contract interpretation is a question of law which may be resolved by summary judgment." *Crown Laundry & Dry Cleaners, Inc. v. United States,* 29 Fed.Cl. 506, 515 (1993). A court's examination of the express terms, specifications, and drawings of the contract constitutes pure contract interpretation conducive to resolution by summary judgment. *See P.J. Maffei Bldg. Wrecking v. United States,* 732 F.2d 913, 916 (Fed.Cir. 1984) (ruling that a review of contract specifications presents a question of law). However, deriving the proper interpretation of a government contract may cause questions of fact to arise. *See Crown Laundry & Dry Cleaners,* 29 Fed.Cl. at 515; *cf. Darwin Constr. Co. v. United States,* 31 Fed.Cl. 453, 456 (1994) (opining that determining the existence of a common trade practice would raise a question of fact). Where these questions present genuine issues of material fact, summary judgment is not appropriate. *See Beta Sys., Inc. v. United States,* 838 F.2d 1179, 1183 (Fed.Cir.1988). In contrast, where these factual questions do not materially affect the outcome of the case, summary judgment may be granted. *H.B. Zachry Co. v. United States,* 28 Fed.Cl. 77, 80 (1993).

## II. Merits

■ In general, this court's analysis of the proper interpretation of a contract proceeds as follows: (1) is the disputed contract language clear or ambiguous? and (2) if this language is ambiguous, is it so ambiguous that the contractor had a duty to seek Government clarification? *See C.W. Over & Sons, Inc. v. United States,* 44 Fed.Cl. 18, 24, 30–31 (1999). In the present case, both parties claim that the contract is clear, each arguing that the contract obviously favors their respective positions. The court's task is to interpret the contract and decide which party's interpretation is consonant with the contract and well-known rules of contract interpretation. Assuming each party's interpretation is consistent with the contract and otherwise is reasonable, the court then is faced with an ambiguity. *See Community Heating & Plumbing Co. v. Kelso,* 987 F.2d 1575, 1579 (Fed.Cir.1993). Both Burke and the Government argue that, assuming ambiguity exists, the ambiguity should be construed against the other party. Consequently, these issues must be decided. First, what interpretation comports with the clear terms of the contract? In other words, which party was correct: the Government in rejecting Burke's demolition plan as conflicting with the contract or Burke for proposing a demolition sequence that would have shut down the trickling filter prior to constructing the replacements? Assuming the contract supports both parties' reasonable interpretations, against which party should the court construe this ambiguity?

## A. Interpretation of Terms of Contract 2175

### 1. Analysis of Paragraph 1.5: What Constitutes "Remain in Operation"

In its motion for partial summary judgment, the Government contends that Burke's interpretation of the contract was unreasonable because Burke's originally proposed sequence of work would have shutdown the existing trickling filter in contravention of paragraph 1.5 of section 01010, which required the plant to remain operational and required Burke to cause the least possible interference to the plant's normal operations. Moreover, the Government asserts that Burke's interpretation would have conflicted with two other contract provisions, the Note on the cover sheet of the contract drawings, which announces that the plant shall remain operational at all times, and the contract's standard Clean Air and Water clause, which

the contract incorporates by reference.[4] In its Opposition to the Government's Motion for Partial Summary Judgment, Burke asserts that the contract drawings and trickling filter media specifications demonstrate that its interpretation was reasonable because these drawings and specifications necessitated that Burke perform in the sequence it originally proposed. In response to the Government's Clean Water argument, Burke argues that its contract interpretation would not have violated the contract's Clean Water clause because that clause requires Burke to insure that its own actions will comply with the CWA, not to guarantee that the Government facility upon which it is working will comply with the CWA. Burke also challenges the Government's Clean Water argument because, according to Burke, it unfairly shifts risk to Burke that the contract's design specifications place squarely on the Government.

In its Reply, the Government seeks to demonstrate the fallacies of Burke's assertions regarding its proposed sequencing by offering several performance alternatives that allegedly would have allowed the STP 2's trickling filter function to remain operational throughout Burke's construction.[5] In contesting Burke's characterization of contract 2175 as including design specifications, the Government asserts that the contract contained performance specifications. Consequently, the Government argues that Burke carried the responsibility of complying with the CWA, and ensuring the results of its performance complied with the CWA.

■ In interpreting a contract, the court's fundamental objective is to ascertain the parties' intent, *see McDevitt Mech. Contractors, Inc. v. United States*, 21 Cl.Ct. 616, 618 (1990) and effectuate the purpose of their

agreement. *Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed.Cir.1991) (citing *Arizona v. United States*, 216 Ct.Cl. 221, 575 F.2d 855, 863 (1978)). The court must start with the express language found in the contract. *Gould*, 935 F.2d at 1274. The representations found in the specifications and drawings, not the subjective intent of the drafter, govern the contract's interpretation. *Salem Eng'g & Constr. Corp. v. United States*, 2 Cl.Ct. 803, 806 (1983). These provisions must be accorded their plain and ordinary meaning. *Thanet Corp. v. United States*, 219 Ct.Cl. 75, 591 F.2d 629, 633 (1979). Where a contract provision possesses a clear, unambiguous meaning, the court's analysis ends. *Textron Defense Sys. v. Widnall*, 143 F.3d 1465, 1469 (Fed.Cir.1998); *see B.D. Click Co. v. United States*, 222 Ct.Cl. 290, 614 F.2d 748, 753 (1980) (ruling that the specifications were clear, and therefore controlling). No other interpretation should be assigned, *see Triax Pac., Inc. v. West*, 130 F.3d 1469, 1473 (Fed.Cir.1997), and no extrinsic evidence need be summoned. *See SCM Corp. v. United States*, 230 Ct.Cl. 199, 675 F.2d 280, 284 (1982).

■ When the meaning of the contract terms is not immediately plain, this court relies on several rules to assist its contract interpretation. The court will attempt to read the contract's various provisions as a harmonious, integrated whole, *Hol-Gar Mfg. Corp. v. United States*, 169 Ct.Cl. 384, 351 F.2d 972, 979 (1965), interpreting these provisions in their larger contractual context, rather than in isolation. *See Gaston & Assocs., Inc. v. United States*, 27 Fed.Cl. 243, 249 n. 7 (1992); *see also* JOHN CIBINIC, JR. & RALPH C. NASH, JR., ADMINISTRATION OF GOVERNMENT CON-

---

**4.** *See* 48 C.F.R. § 52.223–2 (1994). The Government posits that without the trickling filter in operation, the effluent discharged from STP 2 would have exceeded the facility's Clean Water Act (CWA) permit, and thus Burke's interpretation would have disregarded the requirements of the contract's Clean Water clause.

**5.** With its Reply Brief, the Government submits a Supplemental Appendix that includes contract specifications and additional declarations. Burke objects to the Government's submission of the Supplemental Appendix, and requests the

court to disregard various evidence that the Government supplies in the Supplemental Appendix. The Government, in response, contends that the supplemental materials provided with its Reply Brief were to reply to factual issues that Burke raised. The court notes that Appendix H to this court's rules provides that factual representations in motions shall be disregarded unless appropriately supported. RCFC App. H.1. In addition, Burke's "Objection to Evidence Submitted with Reply Brief" is unsupported. Consequently, its Objection is denied.

TRACTS 156 (3d ed.1995) (explaining that an attempt to interpret a contract word, term, or clause in isolation from the other parts of the contract document may distort its meaning and fail to capture the parties' intent). The court will seek an interpretation that accommodates all the terms, and accordingly avoids a conflict in the contract's terms. *Granite Constr. Co. v. United States,* 962 F.2d 998, 1003 (Fed.Cir.1992), *cert. denied,* 506 U.S. 1048, 113 S.Ct. 965, 122 L.Ed.2d 121 (1993); *Hol–Gar Mfg. Corp.,* 351 F.2d at 979. This rule of contract interpretation is so entrenched that contractors are considered to be on notice of it. *See Unicon Management Corp. v. United States,* 179 Ct.Cl. 534, 375 F.2d 804, 806 (1967) ("Contractors, too, have long been on notice that in reading contract documents they should seek to find concord, rather than discord, if they properly can."). A corollary of the court's rule to harmonize all provisions is that the court will not adopt an interpretation which renders a contract term nugatory. *United States v. Johnson Controls, Inc.,* 713 F.2d 1541, 1555 (Fed.Cir. 1983); *see Arizona v. United States,* 216 Ct.Cl. 221, 575 F.2d 855, 863 (1978) (adhering to the rule that the court will avoid an interpretation that renders a portion of the contract "useless, inexplicable, inoperative, void, insignificant, meaningless, superfluous, or achieves a weird and whimsical result.") (citations omitted).

▪ The express language of paragraph 1.5(b), the contractual provision primarily at issue, states "[t]he plant shall remain in operation during the entire construction period and the Contractor shall conduct his operations so as to cause the least possible interference with the normal operations of the activity." Def.'s App. at 17. This provision creates two conjunctive requirements for Burke to observe in its performance: (1) the plant must remain in operation, and (2) in keeping the plant operational, Burke must strive to cause the least possible interference with the plant's normal operations. Other contract provisions also underscore

the importance of maintaining the plant's normal operations. The Note on the Index of the Contract Drawings uses mandatory language in requiring that the plant remain operational. Pl.'s App. at 41. Paragraph 1.5(c) specifies that the contractor's performance includes temporary pumping to insure the continued operation of the sewage treatment facility. Def.'s App. at 17. Finally, paragraph 1.7.5.1 declares that "[t]he work under this contract requires special attention to the scheduling and conduct of the work in connection with existing operations. Identify on the project schedule each factor which constitutes a potential disruption to operations." *Id.* at 18.

The court rules that contract 2175 clearly and unequivocally required Burke to perform in a manner that kept STP 2 in operation during the construction period. Based on this conclusion, the court finds Burke's contract interpretation to be unreasonable because it would have shut down STP 2's existing trickling filter, an integral component of the wastewater treatment process. Burke does not dispute that its initial demolition plan proposed demolishing the existing trickling filter before constructing the two new ones. Nor does Burke dispute that it initially requested the discontinuance of both water and sewage services to STP 2 for the duration of the construction period. Thus, the parties do not dispute that Burke intended to shut down the trickling filter at STP 2. Instead, the parties dispute whether the result of the trickling filter shutdown would be a total plant shutdown. The Government asserts that demolishing the trickling filter prior to constructing the other two "would have resulted in total plant shut down, and rendered STP 2 non-operational. . . ." Def.'s Prop. Findings of Fact ¶ 24. Burke disputes the Government's assertion that demolishing the existing trickling filter would have resulted in a total plant shutdown based on its "plan to bypass this structure, leaving the remaining structures intact." [6]

---

6. Pl.'s Statement of Genuine Issues ¶ 18. Mr. Burke, president and owner of P.R. Burke, who was responsible for the bid and construction schedule, explains that he interpreted "bypass" to mean the bypass of the trickling filter and

imhoff tank during construction, because "the Plans & Specifications would not allow for the continuous operation of the trickling filter stage." Pl.'s App. at 4 (Burke Decl. ¶ 10). However, a review of the demolition plan that Burke

Whether the result of Burke's actions would be a total plant shutdown is more of a play on words and is not the pivotal issue to be decided. *See Anderson,* 477 U.S. at 249, 106 S.Ct. 2505 (emphasizing that the judge's role in deciding a motion for summary judgment is determining whether there is a genuine issue of material fact). What is at issue is the proper interpretation of the express language of the contract: whether Burke's undisputed, intended shutdown of the trickling filter would have permitted the plant to remain in operation, as the contract demands. To resolve this issue, the court must decide what "remain in operation" means.

The dictionary defines "operation" to be "a process or series of acts aimed at producing a desired result or effect." WEBSTER'S II NEW RIVERSIDE UNIVERSITY DICTIONARY 824 (1988); *accord Ralph Larsen & Son, Inc. v. United States,* 17 Cl.Ct. 39, 44 (1989) (relying on the dictionary definition of a disputed term).[7] In this case, the operation to be maintained was that of a sewage treatment plant, which consists of a series of acts aimed at removing and treating raw waste in wastewater before discharging the treated water into the environment. Burke's proposal to shut down the trickling filter for the duration of the project would have removed a critical act, secondary treatment, from the series of treatment acts at STP 2.[8] As the operation of STP 2 consisted of a series of acts, and Burke proposed to remove one of the four major acts in that series, Burke's proposal is inconsistent with the contract's plain requirement of maintaining the operation of STP 2 throughout the project. In light of the fact that this court has determined that a shutdown of the plant's only existing trickling filter would have, in fact, precluded normal plant operation, it is unnecessary for the court to reach the issue of the scope of Burke's compliance responsibilities with respect to the Clean Water Act.

### 2. Analysis of Paragraph 1.5 in Light of Contract Drawings and Trickling Filter Media Specifications

While the court has several significant concerns with Burke's contract interpretation and its divergence from several canons of contract interpretation, the court now must concentrate on whether Burke's interpretation and its reliance on the drawings and filter media specifications justify Burke's proposal to remove the working trickling filter prior to connecting the others. According to Burke, adhering to the contract drawings, which depicted new structures primarily in the area where existing structures stood, made it impossible not to shut down the existing trickling filter because the existing trickling filter needed to be demolished to make room for the construction of the southern trickling filter. Burke cites Modifi-

submitted to the Navy indicates no intention to provide a bypass of the trickling filter. *See* Def. App. at 49–51. Further, to the extent that Burke interpreted the contract as providing for any bypass of the trickling filter, an ambiguity would have resulted in the terms of the contract. See Part II. B., *infra.*

7. This court prefers to use the context in which the contract language appears and the intent of the parties, rather than general dictionary definitions, to provide plain meaning to contract terms. *Fry Communications, Inc. v. United States,* 22 Cl.Ct. 497, 505 (1991). But, in contract 2175, neither the Summary of Work section's "Definitions" clause, nor the incorporated-by-reference, standard FAR Definitions clause define "operation." *See* Def.'s App. at 14 (Summary of Work section); *id.* at 10 (FAR § 52.202–1). While contract 2175 does not define "operation," the immediate context in which "remain in operation" appears, underscores the importance of maintaining STP 2's normal operations, and this importance conflicts with Burke's inter-

pretation. For example, paragraph 1.5(b) not only mandates that Burke keep the plant operational, but also demands that, in doing so, Burke cause the least interference with the normal operations of the plant. Paragraph 1.5(c) notifies Burke that temporary pumping may be required to maintain the plant's operations further emphasizing the plant's continuous operations.

8. Def.'s App. at 150 (Strickler Decl. ¶ 4). The treatment process at STP 2 consists of four interconnected treatment stages: (1) preliminary treatment, removing large debris and gross solids through the use of screens and grit chambers; (2) primary treatment, allowing solids to settle and be removed; (3) secondary treatment, converting indissoluble solids into carbon dioxide, water, and "sludge" through bio-remediation; and (4) advanced treatment, disinfecting microorganisms that passed the other treatment stages by introducing chemical elements to the treated wastewater. *Id.* See also MacDonald–Stephens Engineers, Inc. letter, Def.App. at 108.

cation 1, which changed the location of the new trickling filter pump station, to support its assertion that the original contract drawings necessitated interference with the plant's operations. Furthermore, Burke points to specification 11365–2.1.5.3, which required it to re-use trickling filter media to the greatest extent possible, as further evidence that its proposed demolition sequence was the only acceptable order of performance.

In effect, Burke's arguments revolve around its assertions that the drawings and specification it cites represent design specifications. Design specifications dictate the method of performance and presume that adequate results will follow; whereas performance specifications dictate the result and presume that the contractor will formulate and follow an adequate method of performance. This distinction is crucial to Burke's argument and Burke contends that since the specifications were of a design nature, Burke would not be permitted to deviate from them, *Stuyvesant Dredging Co. v. United States,* 834 F.2d 1576, 1582 (Fed.Cir.1987), but rather would be required to follow the contract's specified manner of performance. *Blake Constr. Co. v. United States,* 987 F.2d 743, 745 (Fed.Cir.), *cert. denied,* 510 U.S. 963, 114 S.Ct. 438, 126 L.Ed.2d 372 (1993).

Assuming without deciding that Burke is correct and that, for purposes of the parties' motions, these provisions should be considered design specifications, Burke's reliance on these specifications still does not support its argument. First, Burke asserts that the trickling filter specification that required Burke to re-use existing trickling filter media in the new trickling filters, in part, forced Burke to shut down the existing trickling filter prior to constructing the others. This provision, however, provides for the re-use of trickling filter media only "to the greatest extent possible." This phrase injects flexibility into the provision, affording Burke the ability to harmonize this provision with paragraph 1.5's requirement that STP 2 remain in operation. Instead, Burke interprets

specification 2.1.5.3 to override paragraph 1.5.

Based on a review of the contract documents, contrary to Burke's position, Burke could have performed its work in the following sequence: (1) construct the northern trickling filter; (2) place new filter media in it (obtained from a source other than the existing trickling filter); (3) commence the operation of the northern trickling filter; and then (4) utilize filter media from the existing trickling filter in the southern trickling filter to be constructed. Such an approach would have promoted concord in the contract terms, rather than the needless discord that Burke derived. This approach simultaneously would have maintained the continuous operation of STP 2, and used existing trickling filter media *to the greatest extent possible,* thereby satisfying both paragraph 1.5 and the command of specification 2.1.5.3. Thus, specification 2.1.5.3 does not necessarily conflict with paragraph 1.5(b), as Burke asserts.[9]

In addition, Burke's argument that the location of various structures prevented it from keeping the existing trickling filter operational is similarly assailable. Burke argues that Drawing C–1, which depicts the southern trickling filter, new trickling filter pump station, and new chlorine contact tank in the same area as the existing trickling filter, to some degree, necessitated that Burke shut down the existing trickling filter. Having the southern trickling filter appear in the same location as the existing trickling filter does not constrain Burke to demolish the existing trickling filter first. The contract required Burke to construct two new trickling filters. Burke could have sequentially (1) constructed the northern trickling filter (one depicted outside the existing trickling filter); (2) established the operation of that trickling filter; (3) demolished the existing trickling filter; and (4) then constructed the southern trickling filter (using existing trickling filter media) in roughly the same place as the existing trickling filter. Burke contends, however, that construction of the

---

9. Even accepting Burke's argument that specification 2.1.5.3 effectively prevented it from complying with paragraph 1.5, a contractual ambiguity would result. For a discussion of resolving

any potential ambiguity in the contract between paragraph 1.5 and the design specifications, see Part II.B., *infra.*

northern trickling filter presented problems because Burke would have had to demolish the imhoff tank to make room for this trickling filter. Yet, under the Project Description in contract 2175, which summarized what Burke was to demolish and construct, Burke was only required to demolish the imhoff tank, not construct a new one. It is clear from the scope of work in the contract that replacement of the imhoff tank was not necessary for STP 2 to remain operational. Consequently, Burke's argument that the location of the new trickling filters prevented it from keeping the trickling filter process operational is not supported by the contract.

In addition to Burke's ability to sequence the project as previously described, Modification 1, which moved the trickling filter pump station away from the existing trickling filter, afforded Burke an additional option. Unlike the imhoff tank, which Burke was not required to replace, Burke was required to install a new pump station to serve the new trickling filters. The operation of the pump station is necessary for the proper functioning of the trickling filters. Accordingly, in order to make the northern trickling filter operational, some connection to a pump station was needed. Burke, theoretically, could have employed two alternatives to accomplish this connection without changing the original location of the new trickling filter pump station: (1) build a temporary pump station and connect it to the northern trickling filter or (2) temporarily connect, through temporary piping, the existing pump station to the northern trickling filter. Both alternatives are feasible pursuant to contract language under paragraph 1.5(c) which provides that: "The contractor shall be responsible for pumping out basins and pipelines of sewage or sludge so as to perform the work. This shall also include temporary pumping to maintain operation of the facility." The

court observes that this provision immediately follows the section requiring the plant to remain in normal operation during the entire construction period. Paragraph 1.5(b). The language contained in paragraph 1.5(c) accommodates the Government's contention that the two alternatives were contemplated within the terms of the contract and available to Burke. Burke, however, did not propose either alternative, nor did Burke perform in accordance with either alternative.

It is clear from the record that the effect of the modification is that it provided yet a third alternative and allowed Burke to construct the trickling filter pump station concurrently with the northern trickling filter (as a result of not waiting until after the demolition of the existing trickling filter), and therefore eliminated the need to provide any form of temporary pumping to render the northern trickling filter operational.[10]

In sum, even if Burke did not possess the ability to deviate from the Government's design specifications, it did admittedly possess the discretion to sequence its work. Entitled to exercise this discretion, Burke could have complied with the trickling filter media specification and also complied with paragraph 1.5 in the contract. As a result, Burke's argument that the trickling filter media specifications forced it to propose to shut down the existing trickling filter is unavailing. Similarly, Burke's ability to schedule its work undermines its argument that the locations of the northern and southern trickling filter forced it to shut down the existing trickling filter. Likewise, Burke's argument that only the issuance of Modification 1 avoided a shutdown of the existing trickling filter during construction must also fail in light of the contract language which alerted Burke to its responsibility to provide temporary pumping where necessary to maintain the operation of the facility. The Government's relocation of

10. Burke could not begin to construct the new trickling filter pump station until it demolished the existing trickling filter because the trickling filter pump station was roughly in the same area as the existing trickling filter. Burke could not demolish the existing trickling filter until it constructed the northern trickling filter and placed it on-line because the functioning of a trickling filter was necessary for the continuous operation of STP 2. Thus, prior to the modification, Burke

would have had to construct the northern trickling filter, then demolish the existing trickling filter, and then construct the trickling filter pump station in that order. By moving the trickling filter pump station outside the area of the existing trickling filter, Burke could construct both the northern trickling filter and this pump station concurrently because Burke's construction of the pump station was not contingent upon the demolition of the existing trickling filter.

the pump station to a site outside the area of the existing tricling filter served only to offer the contractor another option, not to bolster an argument that ambiguity existed in the contract provisions.

## B. Resolving Any Potential Ambiguity: Against Which Party Should the Court Construe the Ambiguity?

Pursuant to the previously discussed analysis, the court has determined that the Government's interpretation of the contract language is consonant with the contract and established rules of contract interpretation while Burke's contract interpretation is found to be unreasonable. However, even if the court were to decide that both parties' interpretations were reasonable, the resulting ambiguity would have to be construed against Burke. The Government primarily asserts that if the requirements in paragraph 1.5 were ambiguous, they were patently ambiguous, and therefore, Burke should bear any additional costs resulting from its failure to clarify the ambiguity prior to submitting its bid. Conversely, Burke argues that any contractual ambiguity should be interpreted against the Government, the drafter of the contract, and because that ambiguity was latent and was not sufficiently discernible to alert Burke to clarify it. In reply, the Government also contends that if any ambiguity was latent, Burke's interpretation was so unreasonable that the court should not accept it, and consequently should not construe the ambiguity against the Government. Thus, the parties differ on the magnitude of the ambiguity, and consequently against which party the court should construe it.

Under the contract law doctrine of *contra proferentem*, the court construes an ambiguity against the party who drafted it. *Interstate Gen. Government Contractors, Inc. v. Stone*, 980 F.2d 1433, 1435 (Fed.Cir. 1992); *Hoppmann Corp. v. United States*, 18 Cl.Ct. 220, 225 (1989). The purpose of *contra proferentem* is to "put[ ] the risk of ambiguity, lack of clarity, and absence of proper warning on the drafting party which could

have forestalled the controversy; it pushes the drafters toward improving contractual forms; and it saves contractors from hidden traps not of their own making." *Sturm v. United States*, 190 Ct.Cl. 691, 421 F.2d 723, 727 (1970). "This rule is especially applicable to Government contracts where the contractor has nothing to say as to its provisions." *Peter Kiewit Sons' Co. v. United States*, 109 Ct.Cl. 390, 418, 1947 WL 5089 (1947). To construe the ambiguity in favor of the non-drafting party, the non-drafting party's interpretation must fall within the zone of reasonableness. *Interwest Constr. v. Brown*, 29 F.3d 611, 614 (Fed.Cir.1994); *Fort Vancouver Plywood Co. v. United States*, 860 F.2d 409, 413 (Fed.Cir.1988); *Big Chief Drilling Co. v. United States*, 15 Cl.Ct. 295, 301 (1988). The non-drafter's interpretation must only be reasonable, not necessarily superior to the drafter's interpretation. *Blinderman Constr. Co. v. United States*, 39 Fed. Cl. 529, 539 (1997), *aff'd*, 178 F.3d 1307 (Fed. Cir.1998) (Table).

However, there is a judicially-constructed exception to *contra proferentem*. Where an ambiguity is patent, the contractor has an affirmative duty to inquire as to the correct meaning of the patently ambiguous term prior to submitting its bid. *See Interstate Gen. Government Contractors, Inc.*, 980 F.2d at 1436; *Avedon Corp. v. United States*, 15 Cl.Ct. 771, 777 (1988). If the contractor fails to inquire, this court will resolve the ambiguity against the contractor. *Jamsar, Inc. v. United States*, 194 Ct.Cl. 819, 442 F.2d 930, 935 (1971) (ruling that the contractor assumes the risk of the ambiguity when it fails to clarify it); *Nielsen–Dillingham Builders, J.V. v. United States*, 43 Fed.Cl. 5, 11 (1999). The Federal Circuit has articulated the rationale for this rule: "the duty of inquiry prevents contractors from taking advantage of ambiguities in government contracts by adopting narrow interpretations in preparing their bids and then, after the award, seeking equitable adjustments to perform the additional work the government actually wanted." [11] However, the patent

11. *Triax Pac.*, 130 F.3d at 1475. Other policy considerations buttressing the patent ambiguity rule include the prevention of post-award litiga-

tion and the protection of other bidders. *See Enrico Roman, Inc. v. United States*, 2 Cl.Ct. 104, 107 (1983).

ambiguity rule is applied narrowly, because to do otherwise, effectively would relieve the government, as drafter, from bearing the consequences of its poorly stated contracts. *Triax Pac.*, 130 F.3d at 1475.

The court determines whether an ambiguity is patent on a case-by-case basis, *Interstate Gen. Government Contractors*, 980 F.2d at 1435; and such a determination raises a question of law. *Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 997 (Fed.Cir.1996). A patent ambiguity has been described as "glaring," *see Triax Pac.*, 130 F.3d at 1474; "obvious" or "gross," *see Grumman Data Sys. Corp.*, 88 F.3d at 997; and found in "facially inconsistent provisions," *see Nielsen–Dillingham Builders*, 43 Fed.Cl. at 11; or where the disputed terms are strewn throughout the contract. *See Interstate Gen. Government Contractors, Inc.*, 980 F.2d at 1435.

■ The purpose of the contract at issue was to perform repair and improvements at the sewage treatment plants. The contract was explicit about the Government's requirement that, during the time the contractor was performing its work, the sewage treatment plant operations were to remain ongoing and without interruption. As previously discussed, Burke's interpretation of the contract provisions would have resulted in the need to shutdown critical operations of the plant which would have completely disrupted normal plant operations. If Burke considered its interpretation plausible, such an interpretation would have created an ambiguity in the contract so blatant that any reasonable contractor would have had a duty to ask for clarification prior to bidding. *See Triax Pac.*, 130 F.3d at 1474. If a contractor fails to conduct such an inquiry, a patent ambiguity in a contract will be resolved against the contractor. *Id.*

In the instant case, not only is it clear that Burke should have known of the ambiguity, Burke's president admits that he was fully aware of it. Burke's President explains in his Declaration that, with the originally submitted construction schedule, Burke also

> submitted a form entitled "Contractors Request for Station Utility Service Interruption" requesting that Sewage Treatment Plant No. 2 be taken off-line throughout the duration of the project. However, at the time of this request was submitted, I was aware that the Navy would almost certainly reject the request. *The request was made with the intent to elicit written direction from the contracting officer as to how the contractor could possibly schedule the project without shutting down the trickling filter stage given the existing Plans & Specifications.*

Pl.'s App. at 5 (Burke Decl. ¶ 12) (emphasis added). This form was submitted approximately one month after contract award. While the court cannot absolutely determine from the record that Burke's president was aware of an ambiguity prior to contract award, nothing in the record reflects why Mr. Burke would not have known prior to September 27, 1994 what he states that he knew as of October 28, 1994.[12] Although the court will not go so far as to find that Burke's president definitely knew of the ambiguity prior to award of the contract, the result remains the same. The court finds that, given Burke's interpretation of the contract provisions, Burke should have known of the ambiguity in the contract requirements regarding Burke's duty to schedule the project and yet maintain the operation of STP 2. It is clear from the record that Burke did not attempt to clarify this patent ambiguity prior to submitting its bid on Contract 2175.[13]

12. If it were clear from the record that Burke knew of the ambiguity, determining whether the ambiguity was patent or latent would be irrelevant since the contractor would have had the affirmative duty of directly alerting the proper Government official of this fact, regardless of whether the ambiguity was patent or latent. *See Solar Turbines Int'l v. United States*, 3 Cl.Ct. 489, 497 (1983) (ruling that, when the contractor knows in fact of the ambiguity, the "duty to inquire arises irrespective of whether the ambi-

guity is patent"); *see also AFGO Eng'g Corp. v. United States*, 227 Ct.Cl. 730, 731–32, 1981 WL 21425 (1981) (rejecting the contractor's reliance on *contra proferentem* because the contractor noted the ambiguity in computing its bid and failed to clarify it).

13. In response to an Interrogatory, Burke stated that it did not inquire, prior to submitting its bid, how the plant was to remain operational. *See* Def.'s App. at 112–13. Furthermore, in its State-

This court can only surmise that if, prior to contract award, Burke had directly inquired with the contracting officer regarding the problems it perceived in the scheduling of the project and the continuous operation of the trickling filter, the delay in the start of the project, and perhaps this litigation, could have been avoided. The court holds that Burke should have been aware of the patent ambiguity arising from its contract interpretation; failed to clarify this ambiguity prior to submitting its bid; and therefore must be held responsible for the delay that ensued.

## CONCLUSION

The court concludes that Burke's contract interpretation was unreasonable and that the Government's interpretation is consonant with the contract provisions. The court further finds that even if both parties' interpretations were deemed to be reasonable, the resulting patent ambiguity would have to be construed against Burke. Burke failed to clarify this ambiguity or otherwise inquire with the appropriate Government official regarding it. Burke must bear the consequences of its failure to inquire. Accordingly, it is hereby **ORDERED** that:

(1) Defendant's motion for partial summary judgment is **GRANTED**. As there is no just reason for delay, pursuant to RCFC 54(b), the Clerk shall enter final judgment dismissing cause of action one in Case Number 96–445C.

(2) The parties shall **FILE** a joint status report on or before October 31, 2000, proposing how to proceed towards final resolution of these cases.

(3) Plaintiff's "Objection to Evidence Submitted in Reply Brief" is **DENIED**.

(4) Each party shall bear its own costs.

ment of Genuine Issues, Burke did not controvert the Government's proposed finding of fact that ("Burke did not seek clarification from the contracting officer prior to submitting its bid of the requirement that STP 2 remain operational at all times,....."). *See* Def.'s Prop. Findings of Fact ¶ 9; Pl.'s Statement of Genuine Issues ¶ 3.