*73 OPINION
Whaley, Judge,
delivered the opinion of the court:
This suit is brought to recover upon a contract between the plaintiffs, doing business as N. P. Severin Company, and the United States, represented by U. S. Grant, 3d, Executive and Disbursing Officer, Arlington Memorial Bridge Commission, as contracting officer. Plaintiffs agreed to furnish all labor and material and perform all work required for the construction of the Boundary Channel Bridge of the Arlington Memorial Bridge Project, Washington, D. C., in accordance with their accepted bid and specifications, schedules, and drawings which were made a part of the contract, for the consideration of $338,000, together with certain unit prices for possible additional contract work. The work was to commence on or before January 28, 1929, and to be finished on or before February 2, 1930. The work was completed and accepted September 17, 1930.
In the aspect of the case, as it is presented, plaintiffs claim the right to recover cost, overhead, and profit on so much of the work as was due to changed conditions resulting from the actions of defendant in imposing certain obligations upon the plaintiffs which were not set forth in the specifications or the contract.
*74 The two main contentions are (1st) that, after the contract was entered into, the Government pumped filling material on Columbia Island on which the East end of the bridge was to be erected, resulting in a heavy layer of silt being deposited within the neat lines of the site, and also adjoining thereto, which required the plaintiffs to remove the same before work could be commenced, and (2nd) that the rock lines, as shown on the drawings, did not give accurate information as to true conditions, resulting in misleading the plaintiffs, because when the rock, as indicated on the drawings, was reached no bedrock was found but only rotten rock and gravel which necessitated plaintiffs’ excavating to a much greater depth, entailing the pouring of large quantities of concrete, delaying the work and retarding other work to the complete disruption of the progress schedule for the completion of the contract. There are other items of extra work and damages sustained, for which plaintiffs sue, but the two claims- mentioned above are the ones on which the case is mainly based.
A determination of this controversy requires reference to certain parts of the contract and specifications and the notice to bidders. It should be mentioned at this point that the plaintiffs were contractors who had undertaken large contracts for the erection of private residences, post-offices, and schools but had never before undertaken the construction of a bridge of any considerable size, and were unfamiliar, from inexperience, with contract work in rivers and harbors.
Under the terms of the contract it was provided that the contracting officer might, by written order, change the drawings or specifications within their general scope and the contract prescribed the method of determining the ultimate decrease or increase in prices. It further provided that, if subsurface conditions at the site materially differed from those shown on the drawings or indicated in the specifications, the contracting officer should immediately make the necessary changes in the drawings and specifications and the contract price should be adjusted by methods set forth therein; that no charge for extra work and material would be allowed unless such work was ordered in writing and *75 allowed by the contracting officer and the price stated in the order; that in case of delay, due solely to the fault of the contractors, liquidated damages were assessable, and the facts and the extent of the delay to be found by the contracting officer were to be final and conclusive on both parties, subject only to appeal to the head of the department.
The specifications were sent to the contractors for the purpose of having their bid made from the requirements thereof.
I. DREDGING ON COLUMBIA ISLAND
Article 10 of the specifications provides:
Bidders to visit site. — Bidders are expected to visit the site of. the work and to inform themselves as to all existing conditions, and also to inform themselves as to the progress and schedules of all work which may be under way or contemplated, such as the dredging operations on and around Columbia Island, etc. Failure to do so will in no way relieve the successful bidder from the necessity of furnishing all equipment and materials and performing all work required for the completion of the contract in conformity with the specifications.
No allowance will be made for the failure of a bidder correctly to estimate the difficulty attending the execution of the work. [Italics ours.]
There was also provided in Article 26 of Section II of the Specifications the following: .
Columbia Island and dredging operations. — Columbia Island has been built up to a height of 16 to 20 feet by dredging from the river channel. The dredging was discontinued during the summer of 1927, but it is likely to be resumed by the time the work of this contract is started or very shortly thereafter, and will be continued indefinitely until dredging work contemplated upon this project is completed. The dredging of the water gate at the Washington end of the bridge will also be started before the work of this contract is finished. The sched-dule of dredging operations can be obtained at the United States Engineer Office, Washington, D. C.
The contractor shall arrange his work so that the dredging may be done without interference from his operations; also he shall protect the dams and levees on Columbia Island against any damage due to the prose *76 cution of Ms work, and shall immediately make good at his own expense any damage which may be so occasioned. [Italics ours.]
Under Article 27 there is the following paragraph:
* * * The contractor shall so conduct his operations . as to allow all other construction work on the Arlington Memorial Bridge project, whether started previously to or after the 'beginning of the work contemplated herein, to proceed as easily as practicable, and he shall provide for and allow the joint occupancy and joint use of all Government-owned land and facilities by all other contractors and (or) agencies engaged in such construction work. * * * [Italics ours.]
Prior to making their bid, plaintiffs visited the site of the project, saw that dredging operations had been performed on Columbia Island and that the dredge was then in the river at the site but actual operations had been suspended. Subsequently, after the contract had been signed, dredging operations on Columbia Island were again commenced and there was poured and deposited upon the site and the surrounding land, a heavy layer of silt which it was found by the contractors necessary to be removed before actual operations on the East end of the work could be commenced. Plaintiffs protested to the contracting officer that the removal of this additional fill was outside of the contract, and the contracting officer authorized its removal. The contracting officer gave plaintiffs a written order to remove 3,618 cubic yards of earth at the East end of the bridge on Columbia Island and authorized payment under Article 33 of the Specifications reading as follows:
Extra Work. — The contractor shall perform all extra work not otherwise covered by these specifications which, in the judgment of the contracting officer, may be necessary or expedient to carry out the intent of the contract or incidental in any way to the work under the contract, and which is ordered in writing by the contracting officer.
The cost of all extra work carried out under the provisions of this paragraph will be paid for on the basis of the actual cost thereof to the contractor (including the hire or rental of such plant as may be used exclusively for such extra work and including also workmen’s compensation insurance, but excluding over *77 head), plus fifteen (15) per cent of that cost to cover profit and all indirect charges against such extra work except those specifically mentioned herein to be included.
The time fixed for the completion of the work will be extended for all extra work by the same method as described in paragraph 31 for changes in amount of work to be done.
However, the plaintiff removed not only the quantity specified by the contracting officer, which was the cubic yardage confined to the bridge site, but also additional fill under derricks. Plaintiffs claim in addition the extra cost of removing prior fill, under bridge site and derricks, incurred by l’eason of its having been saturated by the additional superimposed fill. They also claim the cost and maintenance of plank roads and mats, necessitated by the wet condition of the fill, and the expense of floating equipment, in all, $11,747.65 and, as this was a changed condition, the Government is responsible under Article 4.
The contention of the plaintiffs is that this additional burden was not contemplated by the contract or shown by the specifications and that, in making their bid, plaintiffs had no way of knowing the situation on which to base their estimate, other than as shown by the specifications. However, the specifications distinctly notified plaintiffs that dredging operations would be commenced either before or after the signing'of the contract, and that plaintiffs had to make their bid in contemplation of this work which was to be performed. When the contractors visited the site, before making their bid, they knew that dredging operations had been performed on Columbia Island and saw that the dredge was still in position, and they were also informed by the specifications that further dredging opera-tios were to be performed. With this notification, plaintiffs bid without further inquiry or clarification of the situation. There can be no recovery for the additional amount of material removed for the reason that the specifications distinctly notified plaintiffs of the conditions which arose.
Plaintiffs contend that they were put to additional expense in the removal of the earth beneath the silt because of the fact that the water, which brought the silt on the *78 site, saturated the ground underneath so that extra expense was incurred in removing it in its saturated condition, and that further extra expense was incurred by reason of the saturated condition of the ground in that plaintiffs were prevented from using land equipment and were forced to procure floating equipment. In our opinion, the contracting officer was liberal in his interpretation of the specifications when he allowed the change order for extra work in the removal of the silt on the site of the work. Article 26 of the Specifications notified the contractors that dredging operations would be resumed by the time the work on plaintiffs’ contract was started and would continue indefinitely until the dredging work was completed. Plaintiffs had notice, before and after making their bid and after entering into their contract, of the conditions which subsequently arose, and it was their bounden duty to take the situation into consideration and to protect themselves in their bid and also in the protection of the site either by berm or cofferdam. An experienced contractor, familiar with hydraulic dredging work, with the provision in the specifications (Article 26) before him, would have known that he would have to anticipate, not only silt, but the saturation from the water which brought the silt in. The contracting officer refused to make payment as an extra for this work. We think he was correct in his construction of the contract and, therefore, no recovery can be had for these items.
2. ROCK AND GRAVEL EXCAVATION
The second claim is for expenses of excavating for abutments, cylinders, and piers both on Columbia Island and the Virginia shore below the rock line indicated in the drawings and including concrete in excess of the contract requirement. Article 34 of the Specifications provides:
Estimate of quantities. — The estimated quantities of the major items of the work to be done under this contract are approximately as follows:
Class A concrete_ 750 cu. yds.
Class B concrete- 11, 900 cu. yds.
Granite to be set_ 55, 835 cu. ft.
Reinforcing steel_ 466. 3 tons.
Structural steel- 300. 4 tons.
*79 The above quantities have been computed with ordinary care and accuracy from the contract drawings, and are believed to be substantially correct, but they are furnished only for the information and convenience of bidders and without responsibility to the United States.
Bidders are expected to compute or otherwise to verify from the contract drawings the actual quantities of materials to be furnished and work to be done, and no claims for adjustment arising from any errors, either relative or absolute, which may be discovered in any of the above quantities will be allowed.
The quantity of concrete to be placed as given above was calculated from the contract drawings on the basis of elevations and dimensions indicated. As stated on. the drawings, the elevations shown for bedrock are average only, and departures of about 5 feet either way from those averages may be expected. If, due to unexpected depths to bedroch, the aggregate amount of concrete actually placed in the foundations shall exceed the amount as estimated from the contract drawings, the contractor will be paid twelve dollars ($12) per cubic yard for the excess. However, no deductions will be made in case the aggregate of concrete actually placed in the foundations is less than the estimated amount. [Italics ours.]
When the rock line, as indicated on the drawings, was reached on the Columbia Island side, no bedrock was discovered, but there was encountered a bed of gravel and boulders which was unsuitable for foundations. Plaintiffs were ordered to continue digging. When about 7 feet had been further excavated, decomposed rock was uncovered. This was ordered to be dug into until at about 214 feet deeper plaintiffs were ordered to clean the rock and pour concrete, without having reached bedrock. On the Virginia side when the rock line, as indicated on the drawings, was reached, it was found that this rock was not bedrock but decomposed rock and it was necessary to excavate to an average of 9y2 feet below the point indicated on the drawings where rock was supposed to be reached. The specifications allowed a variation of 5 feet either way. Bedrock was not found, but, after the depth above indicated had been reached, the contracting officer determined that a suf *80 ficient bearing surface could be had by pouring concrete into the excavation. This unexpected dex>th was plainly anticipated in paragraph 4 of Article 34 which provided:
If, due to unexxiected depths to bedrock, the aggregate amount of concrete actually placed in the foundations shall exceed the amount as estimated from the contract drawings, the contractor will be paid twelve dollars ($12) per cubic yard for the excess.
Plaintiffs claim that, due to this condition, they were put to heavy additional expenses, prolonged delays were occasioned, and their whole schedule of progress was thrown out of line. However, the plaintiffs did not furnish schedules of progress either before or after commencing work, as were required by the contract and repeatedly requested by the defendant. The contention is made that this condition amounted to “changed conditions” which fell under Article 4 of the contract and not under Article 34 of the Specifications. Article 34 plainly covered a situation that might otherwise be embraced in other provisions of the contract relating to changed conditions. The conditions which arose were specifically provided for as “unexpected” under Article 34 of the Specifications. The dex>ths to bedrock were unexpected and compensation was likewise specifically provided for in such a contingency.
The contracting officer (Findings 9 and 25) determined the amount of extra concrete to be paid for and allowed plaintiffs $19,922.40 at the rate provided for under Article 34 of the Specifications. The yardage which had been paid for as an extra was to be the difference between that actually poured and that provided in the contract drawings. This was in the contracting officer’s province to determine, and, having determined it, and paid for it, no more is allowable.
The expense of excavating below the rock line of the drawings was incurred in order to get down to bedrock. As Article 34 of the Specifications plainly provided for the contingency of unexpected depths, and the bidders, on reading that Article, were made aware of the contingency, nothing can be recovered to make up for the lack of foresight in calculating the bid so as to include the contingency *81 of unexpected depths. There can be no recovery for extra excavation beyond that allowed by the contracting officer. This disposes both of the direct and indirect expenses for rock and gravel excavations and prevents recovery of all items set forth in Findings 7, 8, and 9.
Plaintiffs were allowed $53,991.34 for the rock and gravel excavations for abutments, piers, cylinders, and incidental bracing and shoring. (Finding 25.) This allowed the contractors basic cost plus 15% thereof to cover overhead and profit and 1%% on the aggregate for cost of bond. This was in strict compliance with Article 48. Plaintiffs contend that they should receive payment under Article 4, which provides for “changed conditions,” and that an equitable adjustment should be made, in which event, they would be entitled to the difference between what it cost the plaintiffs and the contract price. The cost to the plaintiffs was not necessarily an equitable adjustment. There might be charges included excessive in their nature and uncalled for in their character. The contracting officer computed the amount of cost from the daily reports on labor and material furnished by the plaintiffs and made the adjustments in accordance with Article 48. Plaintiffs received compensation for rock excavation in the Virginia abutment, piers, and cylinders. They also received payment for the excavation of the gravel and the bracing and shoring on the Columbia Island cofferdam below rock line and also for extra concrete foundations, in all, the sum of seventy-odd thousand dollars. Thus, having reached this conclusion with respect to the Government’s liability for excess excavation, the item for extra pile lengths is eliminated. (Finding 17.)
3. EAST END WALL
The contract drawings showed a wall to be erected at the East end, known as the East End Wall, which was designed to support the deck of the bridge and not as a retaining wall. The drawings showed back filling on one side of the wall only, whereas there should have been filling on both sides. The plaintiff followed explicitly the drawings, plans, and specifications, and back filled on one side of the wall only. *82 As a result of this back filling on one side, the wall bulged and cracked and the bottom moved out of line some seven inches and the top some ten inches. To an experienced engineer, the error in the drawings would have been apparent and it was the duty of the contractors, with such a glaring error in the drawings, to notify the contracting officer before proceeding with the work. The attention of the defendant was not called to the situation until after the wall had moved out of line and then the plaintiffs were called upon and required to move the wall back in place. The extra expense to the plaintiffs was $5,060.67 and a claim is made for this additional expense.
Article 7 of the Specifications provides that the contractor will not be allowed to take advantage of any errors or omissions in the specifications or in the contract drawings as full instructions will always be given if such errors or omissions are discovered. It was the duty of the contractors, under this article of the specifications, to have called the attention of the contracting officer to this error or omission in the drawings before the work of back filling was commenced. If this had been done, a correction could have been made, or, if not made, the Government would have been liable for the damage. The damage resulted because of the failure of the contractors to carry out Article 7 of the Specifications. It was such a glaring error in engineering construction that the contracting officer was entitled to have his attention called to it by the contractors. There can be no recovery on this item.
4. STONES
Certain of the stones furnished by the Government were not fully cut and finished and ready for setting. Plaintiffs provided this work at a cost of $80.41 and make claim for reimbursement. Under the provisions of the Specifications, Article 89 (quoted in Finding No. 2), the Government was to furnish stones provided, generally, with proper holes before delivery to the contractors, all others to be cut at the contractors’ expense. Certain of the stones were lacking the proper holes. This omission it was the obligation of the contractors to supply at their own expense, which they did. There can be no recovery on this item.
*83 The Government furnished a piece of bullnose granite which, after having been set, was rejected by the Government for defectiveness. The plaintiffs were required by the contracting officer to remove this granite and to place in its stead another piece. This was the fault of the Government in furnishing a defective piece of granite and entailed additional work on the part of the plaintiffs. The Government ordered the work performed and has received the benefit of it. The cost to the plaintiffs was $94.56 and this amount they are entitled to recover.
5. EIRE PROTECTION
During the course of the work, a fire broke out and destroyed property belonging to the plaintiffs and delayed the work. After the fire the contracting officer required the plaintiffs to provide adequate fire protection. The plaintiffs furnished certain fire apparatus and now make claim for reimbursement. Under Article 10 of the contract it is provided:
The contractor shall, without additional expense to the Government, obtain all required licenses and permits and be responsible for all damages to persons or property that occur as a result of his fault or negligence in connection with the prosecution of the work, and shall be responsible for the proper care and protection of all materials delivered a/nd work performed until completion and final acceptance.
Under this provision it was the duty of the contractors to provide proper fire protection and therefore no recovery can be had on this item.
6. BRASS WASHERS
It is conceded that the plaintiffs are entitled to recover for the cost of brass washers furnished by them in the amount of $25.00.
7.INSURANCE ON EAGLE STONES
Under the contract provisions the Government was to furnish carved Eagles as finials of the two pylons at the *84 Columbia Island end of the bridge. However, the Government determined to have the stones erected on the Columbia Island abutments and then to have the Eagles carved after they had been put in place. This was a change in the contract and the plaintiffs were asked to make a bid for the erection of these heavier stones. The first bid made by the plaintiffs included an item of $600.00 for insurance and the contracting officer refused to accept it. Plaintiffs then made a second bid with the item of $600.00 for insurance eliminated. The contracting officer accepted this bid and the plaintiffs performed the work. The plaintiffs, of their own volition, took out insurance on the erection of these stones and paid $600 premium. A claim is now made for this expense. The Government accepted the bid without the insurance item and refused the one with the insurance included therein and the plaintiffs knew when the second bid was made and accepted that the Government would not pay for the insurance. This was a contract and no further sum can be recovered.
8. EXTRA BEAM SET
The plaintiffs used three sets of steel I-beams instead of two, as originally planned by them and now make claim for the cost of this extra set due to the disruption of their program of work. The plaintiffs never furnished a progress schedule of work although the contracting officer demanded it on several occasions. We have held that the progress of work was not impeded by the defendant and therefore the cost of the extra set of I-beams used by the plaintiffs is not recoverable, under Article 44 of the Specifications.
9. BYPASS OE- DRAINS
The contract drawings delineated the course of drains for underpasses. The plaintiffs found it was impossible to lay the drains as shown on the drawings without passing through the cylinders which was an improper method of routing. The plaintiffs bypassed the drains around the cylinders at an extra cost of $495.16. The work was per *85 formed and the change was allowed by the Government and accepted by it, and plaintiffs are entitled to recover on this item.
10. REMOVING ROOK AND GRAVEL IROM CHANNEL J CLEANING UP HOPPER PLANT
During the course of the excavation work, the plaintiffs dumped rock and gravel in the channel instead of hauling it away or using it in other parts of the work. Under Article 40 the plaintiffs were required to remove surplus material, rubbish, etc., and leave the premises at the end of the contract in a neat, clean, and orderly condition. The plaintiffs, however, dumped the rock excavation and the gravel into the channel. Subsequently, they removed it and now make a claim for the extra cost. Under Article 4? of the Specifications it is provided:
None of the excavated material shall be wasted in the Boundary Channel.
The extra cost which was incurred was due to plaintiffs’ own act in violating the explicit directions of the contract.
Plaintiffs also claim the expense of cleaning up the site of their hopper plant. Under Article 40 this also was manifestly to be borne by the plaintiffs.
There can be no recovery on these items.
11. liquidated damages and damages to plaintiff for DELAYS
Under the terms of the contract the completion date was February 2, 1930. The contract was not completed and accepted until September 17, 1930, a period of 227 days. Under Article 9 of the contract liquidated damages were provided for and under paragraph 5 of Article 31 of the Specifications it is provided:
The time fixed for the completion of the work will be extended for increases in the amount of work to be done, or shortened for decreases, by the number of days which bears the same proportion to the number of days fixed for the completion of the work as the *86 aggregate change in cost as computed by the provisions of this paragraph bears to the contract price: Provided however, That in those cases when, in the judgment ox the contracting officer, the application of this rule would be manifestly unfair either to the United States or to the contractor, the contracting officer may waive the rule and adjust the time involved in such cases by negotiation and agreement with the contractor.
Under this provision the contracting officer computed the amount of extra work performed and the cost thereof, as number of days of delay, taking into consideration the it compared with the contract price, allowed the plaintiffs 116 additional days and assessed liquidated damages for 111 days at $100 per day. The contracting officer exercised his judgment in fixing this amount. We have carefully recomputed the number of days allowable and we agree with the contracting officer that the contractors were allowed all that they were entitled to under the contract. There can be no recovery on this item.
The increased amount allowed by the Court over that allowed by the contracting officer for extra work performed does not increase the number of days allowable under this provision of the contract.
What we have said, with respect to the absence of Governmental responsibility for the delays complained of, disposes of the plaintiffs’ two general claims for damages resulting therefrom, that is to say, $41,751.21 and $91,299.78, set forth in Findings Nos. 22 and 23, and no recovery can be had upon them.
Judgment will be entered for the plaintiffs in the sum of $614.72. It is so ordered.
Williams, Judge; LittletoN, Judge; GeeeN, Judge; and Booth, Chief Justice, concur.