P.R. BURKE CORPORATION, Plaintiff,

v.

The UNITED STATES, Defendant.

Nos. 96–232C, 96–445C.

United States Court of Federal Claims.

Nov. 25, 2003.

Sean Brew, The Corona Firm, LLP, San Diego, California, for plaintiff. With him on the brief was Richard Corona.

Gerald M. Alexander, Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him on the briefs were Assistant Attorney General Robert D. McCallum, Jr., and David M. Cohen, Director, Commercial Litigation Branch, and Bryant G. Snee, Assistant Director, Commercial Litigation Branch, Washington, D.C.

### OPINION AND ORDER

LETTOW, Judge.

These consolidated cases concern contracts for improvements to sewage treatment facilities on the Marine Corps Base at Camp Pendleton, California. Before the Court is a motion by the government for partial summary judgment, pursuant to Rule 56 of the Rules of the Court of Federal Claims ("RCFC"), respecting four of ten counts presented in No. 96–445C.[1] The plaintiff, P.R. Burke Corporation ("Burke"), alleges that it performed additional work and incurred further expenses when the Department of the Navy ("Navy") modified the construction to be performed under the contract and concomitantly refused to grant time extensions for the modifications. The pending motion represents the second such motion for partial summary judgment in No. 96–445C; the Court previously granted summary judgment to the government on count one, *P.R. Burke Corp. v. United States*, 47 Fed.Cl. 340 (2000) ("*Burke I*"), and the Court of Appeals for the Federal Circuit affirmed. *P.R. Burke Corp. v. United States*, 277 F.3d 1346 (Fed.Cir. 2002) ("*Burke II*"). The pending motion has

been fully briefed, and a hearing was conducted on November 10, 2003.

### Background

On September 27, 1994, Burke and the Navy entered into Contract Number N68711–91–C–2175 ("Contract") under which Burke was to repair, demolish, or construct various facilities at Sewage Treatment Plant Number Two ("Plant 2") at Camp Pendelton. Compl. ¶¶ 4–5; Motion at 1–2. Burke's work under the Contract was to be completed within 360 days after notice to proceed was given. Contr. § 00720, ¶ 1.1(c); App. at 1. The basic facts and a description of the general contractual framework underlying this case were set forth in the opinions issued by this Court and by the Federal Circuit in *Burke I* and *Burke II*. Those opinions particularly addressed Burke's claim for compensation arising from delays associated with the Navy's rejection of Burke's initially proposed demolition and construction plan ("Plan 1"), specifically the delays from October 24 through October 31, 1994, and November 10 through December 27, 1994. *See Burke II*, 277 F.3d at 1359.

Under the Contract, Burke was required to submit a demolition and construction plan, including a time schedule for the progress of the project, before commencing its work. *See id.* at 1351. Burke submitted Plan 1 early in October 1994, but this plan was rejected because it entailed shutdown and demolition of a key portion of Plant 2 prior to construction of a replacement component, notwithstanding a contractual requirement that "[t]he plant shall remain in operation during the entire construction period." Contr. § 01010, ¶ 1.5(b); App. at 13.[2] The

---

1. The matters before the Court pertain only to the second of the two consolidated actions, No. 96–445C, which addresses construction work at Sewage Treatment Plant Number Two at Camp Pendleton. Consequently, references to pleadings apply only to those in No. 96–445C and not No. 96–232C.

2. Both before and after the work to be accomplished under the Contract, the treatment of wastewater provided by Plant 2 involved four separate steps. As the Court explained in *Burke I:*

The treatment process at [Plant 2] consists of four interconnected treatment stages: (1) preliminary treatment, removing large debris and gross solids through the use of screens and grit chambers; (2) primary treatment, allowing solids to settle and be removed; (3) secondary treatment, converting indissoluble solids into carbon dioxide, water, and "sludge" through bio-remediation; and (4) advanced treatment, disinfecting microorganisms that passed the other treatment states by introducing chemical elements to the treated wastewater.

47 Fed.Cl. at 348 n. 8. Burke's proposed Plan 1 would have demolished the trickling filter that

Navy's rejection of Plan 1 delayed the start of work on the project until Burke submitted an acceptable demolition plan. *Burke II* held that the Navy's rejection of Plan 1 was reasonable, placing sole responsibility on Burke for any expenses related to the ensuing delay due to its failure to abide by the requirements of the Contract. 277 F.3d at 1356–61. Accordingly, for purposes of the present motion, Burke may neither support nor sustain any of its claims of increased costs based on the delays caused by the Navy's rejection of Plan 1.

The currently pending motion by the government focuses on developments following the Navy's rejection of Plan 1, *i.e.,* events that occurred during the last days of 1994 and the early part of 1995. When the Navy rejected Plan 1, it called for Burke to submit a new plan and provided a suggested sequence for Burke's progress that would entail constructing one of the new trickling filters before demolishing the sole trickling filter that was an existing part of Plant 2. On December 29, 1994, Burke submitted a second demolition and construction plan ("Plan 2"). App. at 47. Plan 2 contained a new time schedule and proposed sequence for completion of the project as well as a new price schedule, forecasting that the project would be completed on July 6, 1996, rather than October 7, 1995, as originally contemplated by the Contract. *Id.* A week later, on January 5, 1995, Burke sent a letter to the Navy indicating that Burke "want[ed] to start work right away to clear and grub." App. at 201. However, Burke's letter also indicated that, due to the weather, it could not actually start at that time and that Burke was anticipating that the Navy would issue design changes involving the clearing and grubbing work. *Id.* Burke apparently did not begin work on-site at that time.

Shortly thereafter, three relevant events occurred on January 9, 1995. First, Burke met with the Navy to discuss the project, and the Navy indicated it had identified problems with the time schedule set out in Plan 2. *See* App. at 48. Later, by letter dated January 19, 1995, the Navy formally accepted Plan 2 but rejected the associated time schedule. *Id.*

Second, the Navy issued a Suspension of Work Notice ("Suspension") pursuant to Federal Acquisition Regulation ("FAR") [48 C.F.R.] § 52.212–12,[3] instructing Burke not to commence work clearing and grading the area immediately north of the existing trickling filter. App. at 202. By its terms, the Suspension was to be in place for thirty days. *Id.* However, by a subsequent letter dated January 18, the Navy lifted the Suspension. App. at 212. Burke received this notice on January 23. *Id.*

Third, also on January 9, 1995, the Navy issued Modification P00001 ("Modification 1"), which changed several aspects of the work Burke was to carry out. App. at 204. Modification 1 described the changes to be made in the construction to be performed as follows:

a. Move Solids Contact Basin directly adjacent to Secondary Sludge Pump Station to provide truck access to the sludge beds.

b. Move Trickling Filter Pump Station away from existing Trickling Filter in accordance with the attached drawing.

c. Eliminate excavation, backfill, and fence removal as well as add shoring to new Trickling Filters.

d. Move power pole away from existing Imhoff tank and place away from critical clearing and grubbing.

*Id.* Modification 1 was accompanied by drawings reflecting the changes in the project design. *Id.* at 209–211. The modification also included a "[j]ustification" for each of the changes:

a. Required to move solids contact basin to provide truck access to the sludge beds.

b. It is necessary to move trickling filter pump station away from existing filter to keep the existing trickling filter on line during the construction of the trickling filter pump station.

---

provided secondary treatment, step (3) above, before installing a replacement.

**3.** Unless otherwise indicated, all references to the FAR are to the 1994 edition of Title 48 of the Code of Federal Regulations.

c. It is necessary to eliminate indicated excavation and fence removal to protect several trees and minimize the environmental impact of this construction.

d. Moving the power pole is required to avoid interference during construction and eliminate a potential safety hazard.

*Id.* at 204.

The second and third changes in Modification 1 (items b. and c.) are significant to this case. The relocation of the Trickling Filter Pump Station ("pump station") (item b.) was intended to address a difficulty in the sequencing of the project caused by the original design. As the Court previously explained:

> Burke could not begin to construct the new trickling filter pump station until it demolished the existing trickling filter because the [future] trickling filter pump station was roughly in the same area as the existing trickling filter. Burke could not demolish the existing trickling filter until it constructed the northern trickling filter and placed it on-line because the functioning of a trickling filter was necessary for the continuous operation of STP 2. Thus, prior to the modification, Burke would have had to construct the northern trickling filter, then demolish the existing trickling filter, and then construct the trickling filter pump station in that order. By moving the trickling filter pump station outside the area of the existing trickling filter, Burke could construct both the northern trickling filter and this pump station concurrently because Burke's construction of the pump station was not contingent upon the demolition of the existing trickling filter.

*Burke I*, 47 Fed.Cl. at 350 n. 10.[4] The government contends that the relocation of the pump station was included in Modification 1 only for the convenience of Burke and not to solve any problem with the original design. Hr'g Tr. at 17–20, 30, 70–73. By contrast, Burke claims in count three of its complaint

that the relocation was necessary to solve a sequencing problem and that it caused Burke to incur additional costs because shoring was necessary to install the new pump station. Compl. ¶ 18; *see also* Opp. at 11.

Item three of Modification 1 (item c.) significantly reduced the area that Burke was to clear and grade on the eastern border of the project area, effectively constricting the construction area. *Compare* App. at 42 *with* App. at 210. As the justification for this change quoted above indicates, this element of Modification 1 was included for the convenience of the government, "to protect several trees and minimize the environmental impact of this construction." App. at 204. The change also explicitly required adding shoring to the new trickling filters. *See supra*, at 551 (item c.).

In issuing Modification 1, the Navy explained that it would neither grant additional time to complete the work encompassed by the Modification nor pay any additional money for the changes. App. at 207. The Navy argues that Modification 1 actually amounted to a reduction both in the amount of work that Burke would have to perform and in the amount of time Burke would need because the Modification decreased the area to be cleared and allowed the pump station to be constructed simultaneously with the northern trickling filter. Reply at 9–10. Two months after Modification 1 was issued, on March 9, 1995, Burke requested an additional $104,387 for the work specified in Modification 1, along with an enlargement of the contracting period by 32 calendar days. App. at 224.

On March 6, 1995, the Navy issued Modification P00002 ("Modification 2"). App. at 217–19. Modification 2 required Burke to excavate a hole approximately 30 feet in diameter and 20 feet deep, repair a ruptured pipe, and refill the hole. *Id.* at 219. The Modification indicated that Burke would be paid an additional $2,500 for this work but that no additional time would be added to the

4. The Court in *Burke I* discussed the effects of Modification 1 only for purposes of considering whether it belied an ambiguity in the underlying contract, not for the practical effects that Modification 1 had on the performance or cost of performance under the contract. 47 Fed.Cl. at 348–51. And, even in that limited regard, *Burke I* only addressed Modification 1 insofar as the relocation of the pump station was concerned and did not consider any of the other changed elements.

project completion date. *Id.* On March 7, Burke requested $19,597 for the additional work specified in Modification 2 and an enlargement of the contracting period by five working days. *Id.* at 221–223. The Navy responded to this request seven months later by issuing Modification P00008, which allowed Burke an additional 3 calendar days and provided $4,604 above the $2,500 originally allowed in Modification 2 for a total of $7,104. *Id.* at 236–37.

In the currently pending motion, the Navy has argued that Burke's claims in causes of action two through five "directly pertain to the Navy's rejection of [Burke's initial] demolition plan," Motion at 2, and thus should be denied on the basis of the law of this case established in *Burke I* and *Burke II.* In opposing the motion, Burke has argued that its claims in these counts are actually based on *"other* grounds" including "the delays and constructive acceleration caused by the issuance of a Suspension of Work Notice and Modifications 1 and 2, and the Navy's subsequent failure to grant time extensions." Opp. at 3. In resolving these competing contentions, the Court examines each count at issue to determine whether Burke's allegedly increased costs arguably were attributable to factors other than the Navy's rejection of Plan 1, and, if they were, whether genuine issues of material fact exist that should be resolved at trial.[5]

This Court has jurisdiction over this matter pursuant to the Tucker Act, 28 U.S.C. § 1491(a) and the Contract Disputes Act, 41 U.S.C. § 609(a)(1). *Burke I,* 47 Fed.Cl. at 344.

## Discussion

### A. Standard for Decision

Summary judgment is appropriate if there is no dispute as to any material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A material fact is one that would affect the outcome of

the case. *Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. 2505. The movant bears the burden of establishing an absence of genuine issues of material facts. *Celotex Corp. v. Catrett,* 477 U.S. 317, 321–22, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once this burden is met, the onus shifts to the non-movant to point to sufficient evidence to show a dispute over a material fact that would allow a reasonable finder of fact to rule in its favor. *Liberty Lobby,* 477 U.S. at 256, 106 S.Ct. 2505. It is not necessary that such evidence be admissible at trial, but mere denials, conclusory statements, or evidence that is merely colorable or not significantly probative does not suffice to preclude summary judgment. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548; *Liberty Lobby,* 477 U.S. at 249–50, 106 S.Ct. 2505; *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1390–91 (Fed. Cir.1987). A court does not "weigh" each side's evidence when considering a motion for summary judgment, *Contessa Food Prods., Inc. v. Conagra, Inc.,* 282 F.3d 1370, 1376 (Fed.Cir.2002), but rather " 'the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion.' " *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)).

Although the "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action,' " *Celotex Corp.,* 477 U.S. at 327, 106 S.Ct. 2548, trial courts should act with caution in granting summary judgment and may deny it if there is reason to believe that a full trial is warranted. *Liberty Lobby,* 477 U.S. at 255, 106 S.Ct. 2505. Caution is imperative because "[t]hough speedy and inexpensive, summary judgment is nonetheless a 'lethal

---

5. Underlying much of the argument in this case is the collateral issue of whether the Navy's refusal to grant time extensions for the Suspension, Modification 1, and Modification 2 amounted to an acceleration of the Contract for which Burke

may be entitled to compensation pursuant to the "Changes" clause of the Contract. The Court need not resolve this issue to decide the pending motion and, accordingly, does not.

weapon' capable of 'overkill.'" *SRI Int'l v. Matsushita Elec. Corp. of Am.,* 775 F.2d 1107, 1116 (Fed.Cir.1985) (citations omitted).

Applying this standard to the arguments and evidence presented by the parties, the Court grants summary judgment as to one of the contested counts and denies it as to the other three.

### B. Count Two—Temporary Access Road

■ Burke's count two seeks costs incurred in connection with construction of a temporary access road to the Operations Laboratory Building ("OLB"), the situs for Plant 2's chlorination of treated effluent. On March 2, 1995, Burke sent to the Navy by facsimile its Request for Information Number 50 ("RFI 50"). App. at 68. In this RFI, Burke informed the Navy that it "possibly anticipate[d] it [would] dig out the secondary clarifier and close access [to the OLB] within a couple of weeks." *Id.* The RFI stated that its purpose "was to give you 'heads up' so the Navy can make plans for its chlorination to keep the plant running" and indicated that the message was "for your info & use for Navy to keep the plant running." *Id.*

On March 8, 1995, the Navy responded to RFI 50 by noting on the bottom of the request form that the "[c]ontractor must provide access to back per 01010 1.5.B." *Id.*[6] By letter dated March 29, 1995, the Navy affirmed that Burke "must provide access for the operators [of the OLB] at all times." *Id.* at 69. Burke completed an access road in the southern portion of the Plant grounds on March 31, 1995. *Id.* at 78 ¶ h. Shortly thereafter, on April 4, Burke requested $20,090 to cover the expenses of constructing the road and returning the area to its original condition. *Id.* at 70. The Navy denied this request on April 21. *Id.* at 73–74. By count three, Burke now seeks $20,090 for expenses incurred when it allegedly "was compelled to construct an alternative access road to the Project site not called for in the original contract." Compl. ¶ 14.

It has previously been established that the Contract was a performance contract and

that the onus was on Burke to ensure the normal operation of Plant 2 throughout the performance of the Contract. *Burke II,* 277 F.3d at 1357–58. Paragraph 1.5(b) of Section 01010 of the Contract provides that "[t]he plant shall remain in operation during the entire construction period and the Contractor shall conduct his operations so as to cause the least possible interference with the normal operations of the activity." App. at 13.

Burke does not contest the necessity of keeping the OLB operational. Pl.'s Resp. to Def.'s Proposed Finding of Uncontroverted Fact ("PFUF") No. 32. Burke also does not contest that the Contract required construction of "necessary" access roads. Opp. at 4. Paragraph 1.9(a) of Section 00720 of the Contract provides that "the contractor shall comply with all pertinent provisions of Corps of Engineers Manual, EM 385–1–1, entitled 'Safety and Health Requirements Manual,' as amended." App. at 5. Paragraph 21.I.01 of the "Safety and Health Requirements Manual" states, "[t]he contractor shall construct necessary access and haul roads." *Id.* at 44. Burke argues, however, that construction of the temporary access road was not "necessary" to maintain the OLB's operations and that issues of fact exist as to whether the Navy could have taken steps to continue the OLB's operations without access for a time or whether Burke could have avoided the need to build an access road had the Navy granted the time extensions that Burke requested. Opp. at 4–6.

Despite Burke's efforts to place a gloss of factual issues on the contractual requirement to build an access road where needed, this aspect of the dispute boils down to an interpretation of the language of the Contract. Contract interpretation is a matter of law, suitable for resolution by summary judgment. *Burke I,* 47 Fed.Cl. at 345 (citing *Crown Laundry & Dry Cleaners, Inc. v. United States,* 29 Fed.Cl. 506, 515 (1993)).

In its normal operations, the OLB received deliveries of chlorine by truck. App. at 129. Burke has argued that the Navy could have maintained the operation of the OLB by sim-

---

6. The Navy's response also referred to "drawings" that were not included with the materials made available to the Court.

ply stockpiling chlorine on-site before the existing road was closed for construction. Opp. at 5. Burke has also argued that Navy personnel could have reached the OLB by parking their cars and taking a five-minute walk, as required to reach other buildings at Plant 2 that did not have permanent vehicular access. *Id.* at 5–6.

Burke's assertions are to no avail. Eliminating direct vehicular access to a building where an essential step in the treatment operations is performed contravenes the contractual requirement that construction under the Contract be accomplished with the "least possible interference with the normal operations" of the treatment plant. Contr. § 01010, ¶ 1.5(b); App. at 13. Even assuming that it was feasible to stockpile sufficient chlorine at the OLB, which is disputed, an elimination of vehicular access to the OLB, albeit on a temporary basis, would have been a disruption and inconvenience for the Navy's crews who operated the plant.[7] Accordingly, construction of the temporary access road to the OLB was necessary and obligatory under the Contract.[8]

In the absence of a genuine issue of material fact as to Burke's obligation to maintain vehicular access to the OLB and because the Navy is entitled to judgment as a matter of law, the Court grants the government's motion for partial summary judgment as to count two.

## C. *Count Three—Shoring Related to the Trickling Filter Pump Station*

In the third count of its complaint, Burke requests payment for increased costs associated with its use of a shoring system for the trickling filter pump station that was not planned when Burke originally bid for the project. The original design for the Contract placed the pump station at the same location as the existing trickling filter. App. at 42. In Modification 1, the Navy relocated the pump station slightly so that it would be placed adjacent to the existing trickling filter, allowing the pump station to be constructed prior to the demolition of the trickling filter. App. at 209. *See supra,* at 4–5. Burke avers that Modification 1 and the sequencing required to maintain the trickling filter in operation required shoring for the new pump station that would have been unnecessary under the Navy's original design. Opp. at 10–11; Hr'g Tr. at 56–57, 78.

The Contract explicitly incorporated by reference the standard "Changes" clause from the FAR. App. at 8 (listing FAR clauses incorporated by reference and including FAR § 52.243–4 respecting "Changes"). This incorporated regulation provides:

(a) The contracting Officer may, at any time, without notice to the sureties, if any, by written order designated or indicated to be a change order, make changes in the work within the general scope of the contract, including changes—

(1) In the specifications (including drawings and designs);

(2) In the method or manner of performance of the work;

(3) In the Government-furnished facilities, equipment, materials, services, or site; or

(4) Directing acceleration in the performance of the work.

(b) Any other written or oral order (which, as used in this paragraph (b), includes direction, instruction, interpretation, or determination) from the Contracting Officer that causes a change shall be treated as a change order under this clause; *provided,* that the Contractor gives the Contracting Officer written notice stating (1) the date, circumstances, and source of the order and (2) that the Contractor regards the order as a change order.

. . .

---

7. Burke failed to present evidence that elimination of the access road would have been of such short duration that the inconvenience to the Navy would have been *de minimis.* The record does not indicate how long the temporary access road was in use or when Burke reopened the original road and demolished the temporary one. Hr'g Tr. at 40, 75.

8. The need to construct a temporary access road does not seem to have affected the timing of Burke's performance. Notably, when Burke filed its request with the Navy for an adjustment to pay for the temporary road, it did not request any additional time related to such construction. App. at 70–72.

(d) If any change under this clause causes an increase or decrease in the Contractor's cost of, or the time required for, the performance of any part of the work under this contract, whether or not changed by any such order, the Contracting Officer shall make an equitable adjustment and modify the contract in writing.

48 C.F.R. § 52.243–4 (1994).

■ Under the "Changes" clause of a standard government contract, a contractor may receive an equitable adjustment only when it "show[s] three necessary elements— liability, causation, and resultant injury." *Servidone Constr. Corp. v. United States*, 931 F.2d 860, 861 (Fed.Cir.1991) (citing *Wunderlich Contracting Co. v. United States*, 173 Ct.Cl. 180, 351 F.2d 956, 968 (1965)). Additionally,

[t]o recover under the changes clause of the contract, based on a directed or constructive change for work beyond that required by the contract, it must be clear that:

"... each of the other elements of the standard 'Changes' or 'Extras' clause has been present—the contracting officer has the contractual authority unilaterally to alter the contractor's duties under the agreement; the contractor's performance requirements are enlarged; and the additional work is not volunteered but results from a direction of the Government's officer."

*Doninger Metal Products Corp. v. United States*, 50 Fed.Cl. 110, 124 (2001) (quoting *Len Co. & Assocs. v. United States*, 181 Ct.Cl. 29, 385 F.2d 438, 443 (1967)). In this case, the authority of the Navy officers to issue the relevant orders is acknowledged. However, there is a dispute as to whether Modification 1 enlarged Burke's performance requirements as well as a dispute regarding whether the additional work was volunteered.

■ The Navy argues that Burke was required by the Contract to bear the costs of all necessary shoring. Motion at 10. The Navy cites to Paragraph 3.2.1 of Section 02220, Paragraph 1.6.2 of Section 02050, and Structural Note 4 of drawing S–1 to support this contention. *Id.*, referring to App. at 22, 30, 43. However, the Navy's arguments fail to address the very real change in circumstances engendered by Modification 1. Simply stated, Modification 1 relocated the pump station so that it could be built adjacent to an existing structure rather than requiring that it be built in the middle of an open area. *Compare* App. at 42 *with* App. at 210. Although the Navy has contended that Modification 1 reduced the amount of work to be done, Reply at 9, and expanded the options available to Burke to accomplish the construction, Hr'g Tr. at 14–17, 90–92, it has produced no evidence as to the actual, practical effects of the Modification on the required design of or need for shoring at the pump station and consequently on the need for Burke to change its performance accordingly.

The Navy maintains that Burke could have avoided the need for shoring by simply demolishing the existing trickling filter prior to construction of the pump station and that the relocation of the pump station simply allowed Burke to choose for itself when to construct the pump station in the sequence of events. Motion at 11; Reply at 9. Burke has argued that it actually had no choice in the sequencing of this portion of the project because of the Navy's failure to grant extensions for the Suspension and Modification 1. In *Burke II,* the Federal Circuit has explained that, because this contract is a performance contract, "it was Burke's responsibility to 'select[ ] the means [of performance] and assum[e] a corresponding responsibility for that selection.' " *Burke II,* 277 F.3d at 1359 (quoting *J.L. Simmons Co. v. United States,* 188 Ct.Cl. 684, 412 F.2d 1360 (1969)) (alterations in original). In that same vein, this Court previously noted that, at the time Modification 1 was issued, the modification created an additional "option" for Burke to consider when determining the sequence of its work. *Burke I,* 47 Fed.Cl. at 350–51. These observations, however, did not take into account the effect of the Navy's refusal to grant additional time due to the alleged delay caused by the Suspension and the additional work required by Modification 1, both of which occurred after the events surrounding

the rejection of Plan 1. *See id.; supra*, at 551–52.[9]

Burke alleges that Modification 1 required the use of a shoring system, Opp. at 11, and that a shoring system was duly installed. App. at 84–88, 228–229. Insufficient evidence has been presented for the Court to determine whether Burke could have avoided shoring for the new pump station if time were not a consideration. And, Burke could not have made a decision as to the sequence of construction of the Pump Station prior to the issuance of Modification 1. Thus, Modification 1 or the Suspension may have affected Burke's sequencing decision. The effect of the changes included in Modification 1 on the means of constructing the pump station go to the heart of Burke's third count.

The Navy also argues that Modification 1, in fact, was issued to assist Burke in completing the project on time and was issued in response to a suggestion from Burke. Hr'g Tr. at 30–31. The record does not unequivocally support this assertion. When the Navy issued Modification 1, it justified the change on the basis that "[i]t is necessary to move [the pump station] away from existing filter to keep the existing trickling filter on line during the construction of the [pump station]." App. at 204, quoted *supra*, at 551–52. This contemporaneous rationale does not indicate *why* it was "necessary" to move the pump station. Thus, a genuine dispute of material fact exists as to the justification for the issuance of this element of Modification 1.

Because genuine disputes of material fact exist regarding the effect of Modification 1 on the need for shoring at a relocated new pump station, the Court cannot grant the government's motion as to count three.

### D. *Count Four—Shoring Related to the Grit Chamber and Secondary Sludge Pump*

■ Burke's fourth count also is based on the effects of changes made by Modification 1 on the work that Burke was required to perform and on the manner in which Burke could have performed such work. Count four requests $66,685.01 for the increased costs that Burke incurred because of Modification 1 in relation to shoring that Burke installed for a new grit chamber and secondary sludge pump. Compl. ¶ 22–23.

Burke's allegations consist of essentially two elements. First, Burke avers that it was required to install a more costly and extensive shoring system than foreseen when it originally bid the project. Second, Burke avers that the Navy's failure to grant time extensions "forced" Burke to have a subcontractor perform the shoring work. The Navy has conceded that a genuine issue of material fact exists with regard to Burke's allegedly increased costs arising from installing the changed shoring system. Reply at 12 n. 4; Def.'s Resp. to Pl.'s PFUF No. 36. However, the Navy has suggested that the Court should split the count, Hr'g Tr. at 22, granting summary judgment in its favor insofar as its liability for the extra costs associated with Burke's use of a subcontractor is concerned.

Besides relocating several buildings, Modification 1 decreased the area which Burke was to "clear and grub." *Compare* App. at 42 *with* App. at 210. The Navy argues that, despite the changes made by Modification 1, Burke was required to provide any necessary shoring. Motion at 12–14 (referring to Contr. § 02220, ¶ 3.2.1; § 02221, ¶ 1.3.1.1; § 02050, ¶ 1.6.2; drawing S–1, Structural Note 4). Burke, however, avers that the reduction in the area to be cleared required Burke to use a different shoring system than originally planned. Opp. at 15. As originally designed, the large area to be cleared would have been "open to construction" and "would also [have] allow[ed] access and room around the [g]rit [c]hamber to use cantilever shoring," but the reduction in the area to be cleared specified by Modification 1 "compelled Burke to proceed to use a more expensive method of shoring in combination with underpinning." *Id.*

9. In the prior proceedings in this case, the Court could not have made, and it does not now make, a determination on the ultimate issue of whether Burke was entitled to an equitable adjustment of increased payment or time for performance. That question falls outside the scope of the Navy's motions for partial summary judgment.

Similarly to the need for shoring around the pump station in relation to count three, discussed *supra*, the Court is not able, from the undisputed evidence of record, to determine the effects of Modification 1 on the effort required to complete the necessary shoring around the grit chamber and the secondary sludge pump station. If Modification 1 increased the amount of work and attendant expenses, then the Navy could be liable for such increased costs under the "Changes" clause of the contract. *See Cavalier Clothes, Inc. v. United States*, 51 Fed.Cl. 399, 411–12 (2001); *cf. Severin v. United States*, 86 Ct.Cl. 53, 83, 1937 WL 3204 (1937). The Navy has not presented sufficient evidence to support summary judgment in its favor with regard to Burke's alleged need to hire a shoring subcontractor. The Navy argues that, because of the timing of Burke's hiring of the subcontractors, Burke's decision to use a subcontractor must have been based only on the delay caused by the Navy's rejection of Plan 1. Reply at 11–15; Hr'g Tr. at 23. This argument is unpersuasive based on the current record. The Navy in effect asks the Court to infer that Burke could not have recognized the need for a subcontractor when Modification 1 was issued on January 9 and then undergone the steps necessary to select a subcontractor and complete the work by March 20, unless the subcontracting decision was based solely on the rejection of Plan 1, simply because Burke did not file its first request for extra time until March 7. Reply at 12–13. However, the Navy provides no evidence related to the decision-making or selection process used by Burke or otherwise to support its inferences.

Additionally, the work at issue in count four was directly affected by the reduction in the area to be cleared and grubbed. Because the pertinent change was justified by the Navy's contracting officer solely on environmental grounds, App. at 204, ¶ 1.a.(3).c, there is no indication that Burke itself could have anticipated the change in advance of the issuance of Modification 1.

When considering a motion for summary judgment, the Court makes all reasonable inferences in favor of the non-movant. *See Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348.

Because Modification 1 included an unequivocal statement that the contract completion date would remain unchanged despite the different and additional work it imposed, App. at 207, the Court finds it plausible to infer that Burke may have made its decision to hire a subcontractor based on the issuance of Modification 1 and not solely on the Navy's rejection of Plan 1. This potential inference is strengthened by the undisputed fact that additional and different shoring was necessary because of the changes made by Modification 1. Accordingly, because genuine issues of material fact exist, the Court cannot grant the government's motion as to count four.

### E. Count Five—Scheduling Consultant's Fees

■ Burke's fifth count requests reimbursement for $24,966.03 expended when Burke hired a consulting firm to assist in the preparation of revised performance schedules that were submitted to the Navy. Compl. ¶ 25–26. Six days after the issuance of Modification 1 and the Suspension, on January 15, 1995, Burke engaged Excel, Inc. ("Excel") as a scheduling consultant for the project. App. at 247. Burke informed the Navy of such engagement by letter dated January 31. *Id.* at 213–216. On May 10, 1995, Burke requested an equitable adjustment from the Navy for Excel's professional services in the amount of $24,966. App. at 119. The Navy's contracting officer declined this request on August 25. *Id.* at 121–24.

As discussed thoroughly in the Federal Circuit's opinion in *Burke II*, Burke was required by the Contract to provide the Navy with a construction schedule under which the construction would be completed on time and without interrupting Plant 2's regular operations. 277 F.3d at 1359–61. Burke alleges that it was "forced" to compile additional schedules and was "compelled" to hire a consultant to help it do so. Compl. ¶ 25. The Navy argues that because the Contract required Burke to submit an adequate schedule, Burke's costs in preparing such a schedule are not recoverable as additional expenses. Motion at 14–15. The Navy also argues that no provision of the Contract permits the payment of outside con-

sultant fees of the type sought by Burke. *Id.* at 16–17; Reply at 16–17. Burke's brief contains a lengthy discussion of FAR § 31.205–33, which has been interpreted to allow payment of fees for the services of external professionals when such services bear a beneficial nexus to a contract. Opp. at 18–21. The Navy argues that FAR § 31.205–33 is inapplicable in this case because it was not incorporated into the Contract. Reply at 16 (referring to App. at 6–9). However, the Contract incorporates Department of Defense Federal Acquisition Regulation Supplement ("DFARS") [48 C.F.R.] § 252.243–7001 by reference, App. at 9, and that regulation (entitled "Pricing of Contract Modifications") provides that "[w]hen costs are a factor in any price adjustment under this contract, the contract cost principles and procedures in FAR part 31 and DFARS part 231, in effect on the date of this contract, apply." 48 C.F.R. § 252.243–7001. Part 31 of the FAR encompasses regulation 31.205–33, relating to "[p]rofessional and consultant service costs." Accordingly, contrary to the Navy's argument, the Contract does contain a provision for the payment of consultant fees incurred as the result of a change.

Genuine issues of material fact exist as to whether Burke is entitled to payment for its scheduling consultant's fees under the "Changes" clause and FAR § 31.205–33. The Navy has argued that because of the timing of Burke's decision to hire Excel, such decision necessarily was based solely on the delays arising from the Navy's rejection of Plan 1. However, because the consultant was not hired until six days after Modification 1 was issued, it is possible that Burke based its decision at least in part on the issuance of Modification 1 and the Suspension. Given this timing, and in the absence of direct evidence, the Court may not simply infer that Burke's hiring of Excel was based solely on the delays associated with the rejection of Plan 1.

The Navy also argues that the Court should not allow Burke to recover Excel's fees because the Navy received no benefit from Excel's services and that Excel, in effect, merely assisted Burke in preparing a claim. Hr'g Tr. at 25–27. There is some merit to the Navy's position on this issue.

For a cost to be recoverable under a government contract, that cost must be both allowable and allocable under the contract. *See Boeing N. Am., Inc. v. Roche,* 298 F.3d 1274, 1280 (Fed.Cir.2002); *Lockheed Aircraft Corp. v. United States,* 179 Ct.Cl. 545, 375 F.2d 786, 793–796 (1967). In the case of fees for professional services, actual benefit to the government can be critical to recovery. *See Caldera v. Northrop Worldwide Aircraft Servs., Inc.,* 192 F.3d 962, 972 (Fed.Cir.1999). A consultant's fees may be disallowed if those fees are incurred solely to assist in the prosecution of a claim against the government. *See Plano Builders Corp. v. United States,* 40 Fed.Cl. 635, 639 (1998); *see also Reflectone, Inc. v. Dalton,* 60 F.3d 1572, 1577 (Fed.Cir.1995) (holding that a Request for Equitable Adjustment qualified as a "claim" within the meaning of the FAR). In this case, genuine issues of material fact exist as to whether Excel's services ultimately provided any benefit to the government and whether Burke's submission of alternate schedules could properly be classified as merely the submission of a "claim." Accordingly, the Court cannot grant the Navy's motion for summary judgment with regard to count five.

**Conclusion**

The Court concludes that genuine issues of material fact exist respecting counts three, four, and five in case Number 96–445C. The Court further concludes that no such issues of material fact exist as to count two and that defendant is entitled to judgment as a matter of law on that count. Accordingly, it is hereby ORDERED as follows:

(1) Defendant's Motion for Partial Summary Judgment is GRANTED respecting count two in case Number 96–445C and DENIED as to counts three, four, and five in case Number 96–445C.

(2) The parties shall file a joint status report on or before December 23, 2003, addressing the items listed in RCFC Appendix A, ¶ 12 (last sentence), preparatory to trial of these consolidated cases.